**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

LARRY KLAYMAN
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

               Plaintiff,

v.

JULIA PORTER
515 5th St NW
Washington, DC 20001

and

HAMILTON FOX, III,
515 5th St NW
Washington, DC 20001

and

LAWRENCE K. BLOOM
515 5th St NW
Washington, DC 20001

           Defendants.

      **CIVIL ACTION COMPLAINT**

## I.  INTRODUCTION

Plaintiff Larry Klayman ("Mr. Klayman") hereby sued Defendants Julia Porter ("Defendant Porter"), Hamilton Fox, III ("Defendant Fox"), and Lawrence K. Bloom ("Defendant Bloom") for tortious interference and abuse of process.

## II.  JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) in that this is a district in which the defendants are subject to the court's personal jurisdiction with respect to this action as the acts and practices alleged herein occurred and caused damage in this district.

## III.   PARTIES

3.      Plaintiff Larry Klayman (hereafter Plaintiff Klayman or Mr. Klayman) , is citizen of Florida and an attorney and public interest advocate, author, columnist and syndicated radio talk show host ("Special Prosecutor with Larry Klayman" on Radio America) and private attorney who practices and broadcasts in this district and nationally.

4.      Defendant Porter is an individual and is employed as Bar Deputy Disciplinary Counsel at Office of Bar Disciplinary Counsel ("ODC") in the District of Columbia.

5.      Defendant Fox is an individual and is employed as Bar Disciplinary Counsel at ODC in the District of Columbia.

6.      Defendant Bloom is an individual and is employed as a Staff Attorney at ODC in the District of Columbia. All Defendants are citizens of Washington D.C.

## IV.   STANDING

7.      Mr. Klayman has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants, each and every one of them acting in concert jointly and severally in this district.

## V.   FACTS

### BACKGROUND FACTS

8.      ODC was created in 1972 as a result of the Court Reorganization Act, which established the D.C. Court of Appeals. Pursuant to Rule XI of the D.C. Court of Appeals Rules

Governing the Bar, the Office of Bar Disciplinary Counsel purports to serve as the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar. Until recently, its mission statement was as follows: "In this capacity, the Office of Disciplinary Counsel has and claims and admits to have a dual function: to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

9.      Defendants have ignored this requirement  and have engaged in the equivalent of a partisan politically based agenda and in effect a "jihad" to have Mr. Klayman removed from the practice of law, after Klayman's 40 year history of continuously been a member in good standing of the District of Columbia Bar. Mr. Klayman has been a member continuously in good standing of The Florida Bar for almost 43 years. *See* Exhibit 1 – *Certificate of Good Standing and Biography.*

10.     Indeed, Defendant Porter admitted as much at a hearing in a disciplinary matter where they could not even obtain a preliminary non-binding finding by a Board of Professional Responsibility Ad Hoc Hearing Committee that Mr. Klayman had violated any ethical rule of the bar. Attached as Exhibit 2 is a copy of this preliminary non-binding finding. During the closing argument at the hearing which led to this finding, Defendant Porter on behalf of herself and ODC incredibly proclaimed and admitted that it was her and ODC's position that Plaintiff Klayman "should not continue to have the privilege of being a lawyer."  Exhibit 3. This is Defendants' admitted agenda.

11.     As part of their scheme to severely and irreparably harm and damage Mr. Klayman by attempting to remove him from the practice of law, Defendants have chosen to use the tactic of harassing and financially harming Plaintiff Klayman, if not bankrupting him, by a

series of bar proceedings that lack merit, but which incur huge attorney time, resources and monies to defend. Thus, even when they fail in their attempts to have Mr. Klayman disbarred, they are attempting to accomplish the same purpose by destroying his legal practice and he and his family's well-being financially by having to defend, at huge cost in terms of legal fees, costs and time, their frivolous attempts, at District of Columbia taxpayer expense but not their own, to have him removed from the practice of law in the District of Columbia.

12.     It is apparent that Defendants' attempts to remove Plaintiff Klayman from the practice of law stem from his conservative, pro-Trump public and private advocacy as the founder of both Judicial Watch and now Freedom Watch, which they abhor. While this regrettably is a sign of the times in the highly charged political atmosphere of the nation's capital, this  conduct is both unethical and illegal nevertheless.

13.     Indeed this is the same ODC that entertained a frivolous bar complaint by leftist law professors, including avowed communist law professor Michael Tiger, filed against Kellyanne Conway for statements made on television,[1] as well as recent frivolous complaints again by leftist law professors who included  former assistant ODC counsel Michael Frisch, against even Attorney General William Barr.[2] On the other hand, this ODC refused to investigate a complaint filed by attorney Ty Clevenger against David Kendall, Hillary Clinton's attorney that allegedly aided in the destruction of emails and thus an obstruction of justice pertaining to the Benghazi scandal[3]. These are just a few examples of their politically based selective

---

[1] https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html
[2] https://abovethelaw.com/2020/07/bill-barr-racks-up-yet-another-bar-complaint/
[3] https://personalliberty.com/state-bar-prosecutors-flouting-law-protecting-hillary-clinton-lawyers/

prosecutions. It is clear that ODC has been systematically targeting conservatives and Republicans, including Mr. Klayman.

14.     Defendant Fox has made his leftist political ideals known, as he has contributed heavily to Barack Obama's presidential campaign as well as other leftist Democrats.

15.     Not coincidentally, Defendant Porter and ODC have engaged in similar unethical, if not illegal, tactics with regard to other members of the District of Columbia Bar who they arrogantly decide for themselves, for whatever improper reason, should no longer have the privilege of practicing law in the District. Another District of Columbia lawyer, J.P. Szymkowicz, filed a complaint for similar unethical and illegal conduct, which has given rise to an unprecedented internal Board of Professional Responsibility ("Board") review of the unethical and illegal conduct of Defendant Porter and ODC. Such an internal review is almost unheard of in the annals of the history of ODC and the Board. Exhibit 4.

## **FACTS PERTAINING DIRECTLY TO MR. KLAYMAN'S CLAIMS**

16.     On June 11, 2020, the District of Columbia Court of Appeals ("DCCA") issued a 90-day suspension order against Mr. Klayman regarding an alleged conflict of interest that occurred over a decade ago, a more than incredible twelve years ago to be exact.  This disciplinary action is time barred under the laws of Texas, as set forth below. Defendants, on information and belief, knew that reciprocal discipline is time barred in Texas, before they intentionally sent the above-mentioned letter and on information and belief engaged in other ex parte communications with this Court to interfere with his cases for clients in his district and harm Plaintiff Klayman as alleged herein.

17.     Plaintiff Klayman decided to challenge the DCCA's order via Petition for Rehearing by the Panel as well as a Petition for Rehearing En Banc.

18.     Defendants were at all material times aware that Mr. Klayman was challenging the DCCA order, and that there had been no conclusory order from the DCCA.

19.     While Mr. Klayman's challenge was still pending, and there had been no conclusory order from the DCCA, Defendants decided to tortuously interfere with Mr. Klayman's profession as a conservative public interest attorney by sending out *ex parte* letters, which were not copied on Mr. Klayman to various courts that Mr. Klayman is admitted and/or licensed to practice in notifying them of the DCCA order.

20.     These letters were sent out behind Mr. Klayman's back, without Mr. Klayman's knowledge or consent, and he only learned of such letters when, as set forth below, this Court posted one on its docket, a considerable period after Plaintiff Klayman politely asked this Court to disclose how it had learned of the June 11, 2020 order of the DCCA. When asked this question, the Honorable Jane Boyle, who is presiding over potential reciprocal discipline in this district, did not disclose the letter but suggested that she had learned of it through the media.

21.     On information and belief, Defendants sent out *ex parte* letters to all of the state and federal courts that he is admitted to practice in, despite any express authority under the District of Columbia Rules of Professional Conduct to do so.

22.     Mr. Klayman has asked Defendants to provide copies of these *ex parte* communications, but Defendants have flatly refused to do so, evidencing  that they know they have something to hide.

23.     As referenced above, one such *ex parte* letter came to this Court, the U.S. District Court for the Northern District of Texas, Exhibit 5, where Mr. Klayman had pending a class action lawsuit against Defendants The People's Republic of China to seek redress for the damages caused by the ongoing worsening pandemic. (3:20-cv-656). Mr. Klayman has also filed

a lawsuit, which is currently on appeal, on behalf of African American police officer and Texas congressional candidate, Demetrick Pennie, over libel and defamation from the Dallas Morning News, which was alleged to have acted in concert with other Defendants, some of which are public officials. (3:19-cv-1945).

24.     This *ex parte* letter was signed by Defendant Bloom, and prepared and sent by Defendants, working together in concert.

*25.*     Defendants sent this *ex parte* letter despite the fact that they knew that the severely delayed District of Columbia disciplinary proceeding and subsequent DCCA order would at a minimum have been subject to laches in Texas. *See Gamez v. State Bar of Tex.*, 765 S.W.2d 827, 833 (Tex. App.—San Antonio 1988, writ denied).

26.     As a result of Defendants' conduct, the Honorable Jane Boyle ("Judge Boyle") opened a disciplinary case against Mr. Klayman regarding reciprocal discipline. (3:20-mc-00043).

27.     Even though Mr. Klayman has not exhausted his challenge of the DCCA's order to this day, Judge Boyle had precipitously ordered the clerk of this Court to remove Mr. Klayman's electronic filing privilege, preventing him from filing pleadings in the ongoing case against the People's Republic of China.

28.     Previously, before even imposing reciprocal discipline, however improper and without due process, she ordered Mr. Klayman not to file any more cases in this Court. (3:20-mc-00043, ECF No. 6).

29.     In that same order, (3:20-mc-00043, ECF No. 6), Judge Boyle granted Mr. Klayman 30 days to file a supplemental response once the order of the DCCA had become final.

30.     However, even at the time of the filing of this Complaint, 30 days have not elapsed since a conclusory  decision has not been  rendered by the DCCA, as there is still pending a Motion for Clarification and for Reconsideration of Order of July 31, 2020 and Leave to File and Have Considered on the Merits in the Interests of Justice. Despite this, Judge Boyle precipitously imposed reciprocal discipline on August 14, 2020, in contravention of Mr. Klayman's due process and other rights, as well as LCvR 83.8(h)(3), which states:

> If the member responds and, in whole or in part, opposes reciprocal discipline, the chief judge, or a district judge designated by the chief judge, must designate three district judges to hear the matter. The decision of a majority of the three-judge panel concerning the appropriate discipline shall be the final ruling of this court.

31.     Mr. Klayman had previously requested due process and the chance to retain counsel and have a hearing, but was improperly and without due process denied that right, even though it is written in to the Local Rules of this Court.

32.      As set forth in the attached email from Mr. Klayman to Defendant Fox on August 9, 2020, Defendants had no authority to contact the other state and federal courts regarding the DCCA order, and that their conduct amounted to tortious interference and abuse of process. *See* Exhibit 5.

33.     Plaintiff Klayman has moved Chief Judge Barbara M.G. Lynn to intervene with regard to Judge Boyle's precipitous orders, without due process, summarily imposing reciprocal discipline on Plaintiff Klayman, but she has failed to do so, creating the presumption that she is complicit and is acting in concert with Defendants and on information and belief instructed Judge Boyle to take the above described actions against Plaintiff Klayman. See Exhibit 6. Chief Judge Lynn is an appointee of former President Barack Obama and in his public interest capacity Mr. Klayman has sued Obama on multiple occasions, one of which was before this Court. *Klayman v. Obama*, 3:16-cv-2010.

34.     Incredibly, this motion was summarily denied just one day later without any explanation why Mr. Klayman had been denied due process under the Court's own rules , not by Judge Lynn, but by Judge Boyle. This shows that these two judges are acting together in concert, influenced and provoked by the alleged ex parte tortious actions of Defendants, as pled herein.

35.     As a result, not only has Mr. Klayman been irreparably harmed, more importantly, his clients have been severely harmed, as the counsel that they retained to represent him in this Court has been, precipitously and without just cause, denied and taken away from them.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Tortious Interference*

36.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

37.     Mr. Klayman had an ongoing business relationship and/or contract with his clients in the cases before this Court styled *Buzz Photo v. People's Republic of China*, 3:20-cv-656, as well as *Pennie v. Martin et al*, 3:19-cv-1945.

38.     Defendants knew of the business relationship and/or contract between Mr. Klayman and his clients.

39.     Defendant willfully and intentionally and vindictively interfered with this contract by sending out a letter notifying this Court about the DCCA's challenged order, although they had no authority to do so. On information and belief Defendants have also engaged in other improper ex parte communications with this Court. Plaintiff Klayman has requested full disclosure by this Court, but this has not been forthcoming.

40.     As a direct and proximate result of Defendants' actions, Mr. Klayman has been left unable to litigate these cases, and therefore has suffered irreparable harm to his reputation, his business and person and his calling, as well as to his clients' interests.

### SECOND CAUSE OF ACTION
*Abuse of Process*

41.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

42.     Defendants have abused process by prematurely notifying and on information an belief engaging in other ex parte contacts with courts and state bars, and in particular this Court, in which Mr. Klayman is admitted to practice of the DCCA order, despite having no authority to do so, especially since Mr. Klayman had not exhausted his constitutional rights to challenge the order. As set forth above, any reciprocal disciplinary action in this Court is time-barred and Defendants knew or had reason to know of this before they set out to intentionally interfere with and abuse process, all with the design and intent to vindictively harm Plaintiff Klayman and his clients' interests.

43.     The unethical and illegal conduct of Defendants constitutes abuse of process because they have misused the attorney discipline process to try to harass and financially and otherwise harm Mr. Klayman by preventing him from practicing in jurisdictions, and in particular this jurisdiction,  where he is not suspended.

44.     Defendants possessed an ulterior motive insofar as they are driven by a personal animus and vendetta in order to have Plaintiff Klayman removed from the practice of law, harm his clients' interests and have Plaintiff Klayman bankrupted as a result of the enormous time and monies required to put on a defense.

45.     This abuse of process, as pled herein, has caused and is continuing to cause severe and irreparable damage to Plaintiff Klayman, as well as to his clients' interests.

46.     Defendants, each and every one of them, are not above ethics and the law and have no immunity for their actions, as they were undertaken in contravention of their lawful and delegated authority, as set forth above. However, Defendants  tortious conduct and modus operandi are that they can do as they please, without ethical or  legal consequence, as in their view they do not have to abide by the same ethical and legal standards as other members of the District of Columbia Bar. Indeed, Defendants, each and everyone one of them, have no authority or jurisdiction to tortuously interfere with, abuse process and harm Plaintiff Klayman in the state of Texas, where their actions are time-barred in any event.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against each Defendant, jointly and severally, as joint tortfeasors as follows:

(a)     For general (non-economic), special (economic), actual and compensatory damages in excess of $75,000.00 , as well as injunctive relief;

(b)      For actual and consequential damages in a sum reasonable to a jury;

(c)     For punitive damages in an amount to be determined at trial by a jury of Plaintiff's peers to punish and impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(d)     For attorneys' fees, expenses and costs of this action, and;

(e)     For such further relief as this Court deems necessary, just and proper.

### DEMAND FOR TRIAL BY JURY

Mr. Klayman demands a trial by jury on all counts as to all issues so triable.

**Dated**: August 26, 2020                    Respectfully submitted,

*/s/ Sanjay Biswas*
Sanjay Biswas, Esq.
TX Bar # 24061235
11720 Duxbury Dr.
Frisco, TX, 75035
Tel: 972-866-5879
sanjaybiswas41@gmail.com

*Counsel for Respondent*

*/s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
Email: leklayman@gmail.com

*Respondent Pro Se*

# EXHIBIT 1



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

**Joshua E. Doyle**
**Executive Director**

**850/561-5600**
**www.FLORIDABAR.org**

State of Florida        )

County of Leon        )

In Re:  0246220
Larry Elliot Klayman
Klayman Law Group, PA
2020 Pennsylvania Ave NW # 345
Washington, DC 20006-1811

I CERTIFY THE FOLLOWING:

I am the custodian of membership records of The Florida Bar.

Membership records of The Florida Bar indicate that The Florida Bar member listed above was admitted to practice law in the state of Florida on **December 7, 1977**.

The Florida Bar member above is an active member in good standing of The Florida Bar who is eligible to practice law in the state of Florida.

Dated this 25th day of  **August**, **2020**.

Cynthia B. Jackson, CFO
Administration Division
The Florida Bar

PG:R10
CTM-99353

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages— English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

# EXHIBIT 2

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
AD HOC HEARING COMMITTEE



In the Matter of               :
                               :

    LARRY E. KLAYMAN,      :
                               :    Board Docket No. 18-BD-070

Respondent.              :    Disc. Docket No. 2017-D051
                               :

A Member of the Bar of the    :
District of Columbia Court of Appeals:    :
(Bar Registration Number: 334581)    :

<u>ORDER</u>

A hearing was held in this matter on July 15 – 16 and July 18, 2019 before Buffy J. Mims, Esquire, Chair of the Ad Hoc Hearing Committee; Dr. Robin J. Bell, Public Member; and Christian S. White, Esquire, Attorney Member.  Deputy Disciplinary Counsel Julia Porter, Esquire, represented the Office of Disciplinary Counsel and Respondent appeared *pro se*. Following the conclusion of the evidentiary portion of the hearing and the parties' respective closing arguments, the Hearing Committee went into executive session and determined that it could not make a preliminary finding that Disciplinary Counsel had proven any disciplinary rule violation. This order sets forth the post-hearing briefing schedule.

As a preliminary matter, the parties' List of Exhibits forms appear not to have been filed with the Board office.  Thus, the parties are directed to review each other's List of Exhibits Form and note on such Forms those exhibits that were admitted

during the hearing.   The parties shall file their respective forms on or before **August 12, 2019**.

The parties are directed to file proposed findings of fact and conclusions of law according to the following schedule:  Disciplinary Counsel's opening brief is due on or before **August 26, 2019;** Respondent's response brief is due on or before **September 18, 2019**; and Disciplinary Counsel's reply brief is due on or before **September 30, 2019**.  Respondent shall not file a responsive document without leave of the Chair.

Disciplinary Counsel's opening brief shall contain proposed findings of fact that shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record that support the facts set forth in that paragraph. Respondent's brief shall contain a response to each numbered paragraph in Disciplinary Counsel's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon. Respondent's proposed findings of fact shall consist of numbered paragraphs, including within each paragraph specific references to the parts of the record relied upon.  If Respondent proposes additional findings of fact, Disciplinary Counsel's reply shall contain a response to each numbered paragraph in Respondent's proposed findings of fact, including, in the case of any disagreement, specific references to the parts of the record relied upon.

2

In addition to filing hard four copies of each submission with the Office of the Executive Attorney, as required by Board Rule 12.1(b), each party shall also submit an electronic copy of the word processing file used to produce each brief, by filing a cd-rom or flash drive with the Office of the Executive Attorney, or by emailing the word processing file to the Board's Case Manager, Meghan Borrazas at CaseManager@dcbpr.org.

The Office of the Executive Attorney is directed to serve a copy of this Order by email and U.S. Mail.

It is so Ordered.

AD HOC HEARING COMMITTEE

By: _____
    Buffy J. Mims
    Chair

cc:

Larry E. Klayman
2020 Pennsylvania Avenue
#800
Washington, D.C. 20006

And to:

269 South Beverly Drive
Suite 1298
Beverly Hills, California 90212
leklayman@gmail.com

Julia L. Porter, Esquire
Senior Assistant Disciplinary Counsel
Office of Disciplinary Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C.  20001
porterj@dcodc.org

# EXHIBIT 3

In Re:  Larry E. Klayman
July 18, 2019

Page 806

1    Cliven Bundy, who thankfully no one else will
2    represent unless someone like Larry Klayman comes
3    in.
4            There are other lawyers who have done this
5    in the past, with different political stripes --
6    Ralph Nader, who actually I know, counselor, others,
7    you need lawyers like that.  You don't want to remove
8    them from the practice of law because then you leave
9    criminal Defendants and civil litigants at the mercy
10   of the big powers, the rich and the powerful who want
11   to and will use their power to try to destroy them,
12   thank you.
13           CHAIRPERSON MIMS:  Any response, Miss
14   Porter?
15           MS. PORTER:  No.
16           CHAIRPERSON MIMS:  Alright, why don't we
17   take a break.  I would say come back and wait for us
18   in 20 minutes.  I don't know that we'll be done in 20
19   minutes.  It may be longer.  If you want to take a
20   longer break, we can say a half an hour, a half an
21   hour?  Let's reconvene at a half an hour, and if
22   we're not back in a half an hour it means that we're

Page 807

1    not ready yet, so just try and hang around closely to
2    the courtroom.
3            We're off the record at 3:57, thank you.
4            (Off the record 3:57.)
5            (On the record 5:22.)
6            CHAIRMAN MIMS:  Alright, we're back on
7    the record at 5:22.  So, the Hearing Committee has
8    been unable to reach a non-binding determination.
9    So, at this point we're going to have to set a
10   briefing schedule.
11           Before we do that, I do want to talk a
12   little bit about what we'd like to see in the briefs
13   in some of the areas that -- of why we're unable to
14   come to an agreement and find a violation.
15           It's a clear and convincing case, so for
16   the statements and let's start with the pro hac
17   motion.  For the statements, for the omissions or the
18   misleading things that you found in there where you
19   believe that there were violations, we would like you
20   to be very specific about those.
21           I know that in your closings you did go
22   through a number of examples.  I mean we've gone

Page 808

1    through the misrepresentation of Mr. Whipple's
2    experience.  Mr. Klayman's misrepresentation or
3    misleading of his own criminal experience.  The issue
4    of not disclosing the Hearing Committee report, and
5    addressing his arguments that it wasn't final, that
6    it was an ongoing matter and also that the
7    affidavits, the sworn testimony that he had violated
8    a rule, that that had been withdrawn.
9            Accusing Judge Navarro of being malicious
10   and corrupt.  For each of these items -- we need you
11   to specifically spell out how that rises to the level
12   of clear and convincing.  And on the same token, Mr.
13   Klayman, we need -- what I'd like you to do is for
14   your statement of facts, listed out in paragraph
15   form, so that Mr. Klayman can either admit it or
16   deny it.
17           And Mr. Klayman, we need you to respond
18   specifically to the statements in the brief.  I
19   understand that you may think that there is a big
20   issue with 6th Amendment in here, we don't really see
21   that.  There may be a very limited case in which you
22   might bring that up, but I doubt it's going to be

Page 809

1    much.
2            And bar counsel's brief, the extent that
3    it's in your response I think can be pretty limited.
4    I mean you've made your points on the 6th Amendment
5    issue and the constitutionality issues.  We've heard
6    them.  I think the relevance is probably limited in
7    terms of your advocacy of the issue, and so I really
8    need you to respond so that the Committee can sift
9    through all of this.
10           Respond to her points in the brief.  You
11   admit it, or you deny it.  And if you deny whatever
12   fact it is, give us a specific reason of why you deny
13   it.  Okay.  So, the timing is generally 10 days
14   after the transcript comes in, and as I understand it
15   the transcript comes in in two weeks.
16           MR. KLAYMAN:  Your Honor, may I address
17   you on that?
18           CHAIRPERSON MIMS:  Yes.
19           MR. KLAYMAN:  If we may have additional
20   time, my wife is pregnant and will be giving birth
21   around this time period.
22           CHAIRPERSON MIMS:  Okay, when is --

42  (Pages 806 to 809)

In Re:  Larry E. Klayman
July 18, 2019

|  | Page 770 |
|---|---|

1    ask the court to sanction him, and it's very rare for
2    a court to do it sua sponte, but that does not mean
3    that the statements that he made to the court were
4    not false as the court found, including the 9th
5    Circuit, or that these claims that he made against
6    Judge Navarro, Judge Bybee and others had any merit
7    -- they didn't.
8            No reasonable lawyer could think that the
9    claims that he made against Judge Navarro and later
10   Judge Bybee had any merit or any chance of success.
11   You know, and again legally they were without basis
12   -- judges are absolutely immune, so are Presidents.
13           The allegations of this vast conspiracy
14   between Judge Navarro and others -- as Judge Navarro
15   found, displayed a lack of respect for the judiciary
16   and a complete lack of ignorance of the independent
17   jury.  And as the 9th Circuit found, they were for
18   intimidation and retaliation because she had denied
19   his pro hac vice.
20           And I'll get finally to the last issue and
21   that is kind of the repetitive nature of the claims.
22   Yes, in some of the petitions Mr. Klayman said they

|  | Page 771 |
|---|---|

1    were changed circumstances, but if you go back and
2    look at the second 9th Circuit decision denying his
3    second petition, which I believe is 79, you'll see
4    that those changed circumstances -- the IG's report,
5    or alleged government misconduct.
6            They had nothing to do with whether or not
7    the pro hac vice application should have been granted
8    or that Judge Navarro had a basis to deny it.  And
9    indeed, these claims have changed circumstances for
10   procedural, completely inappropriate because they
11   were being raised for the first time on appeal.  But
12   it was the -- it wasn't just these changed
13   circumstances, but a lot of the allegations that
14   I've already gone over -- that Mr. Whipple was
15   threatened with contempt, that Mr. Bundy was ordered
16   in solitary confinement.
17           That Mr. Klayman had been completely
18   honest on his pro hac vice, that Judge Bybee lacked
19   appreciation and sensitivity because his prior
20   rulings or involvement in the drafting of a memo.
21   These were repeated, sometimes verbatim, over and
22   over and over again.

|  | Page 772 |
|---|---|

1            And even his claim, which disciplinary
2    counsel doesn't claim was illegitimate or wasn't made
3    in good faith, that Mr. Bundy should have been given,
4    you know, his right to counsel of choice
5    notwithstanding the disciplinary matters.  That's a
6    legitimate argument, but it's not okay to raise it
7    in at least 15 -- at least 15 separate pleadings,
8    over and over and over again, which he did, and I can
9    cite to all of them in our post-hearing brief.
10           So, I think the evidence shows both
11   clearly and convincingly that Mr. Klayman engaged in
12   misconduct.  And I confirmed that the record of the
13   pre-hearing motions and -- which include the
14   disciplinary complaints that Mr. Klayman filed
15   against disciplinary counsel, are already part of the
16   record.
17           And I'd say his conduct in this proceeding
18   confirms that he should not continue to have the
19   privilege of being a lawyer because he cannot conform
20   himself to the ethical rules.
21           CHAIRPERSON MIMS:  Before you step down, I
22   don't know if anyone else has any questions.  I do

|  | Page 773 |
|---|---|

1    have one question and maybe you've answered it, but I
2    want to be sure I'm clear.  Under Rule 8.1, which is
3    one, it's in the specification of charges and you've
4    discussed a little bit.  Rule 8.1 is, you say, "In
5    his application and supplemental application for
6    admission to the District Court, Respondent
7    knowingly made false statements of fact or material
8    fact, and he failed to disclose a fact necessary to
9    correct a misapprehension known by the applicant."
10           I just want to be clear on what that
11   misapprehension is that you're referring to?
12       A   Well, and I think I've kind of gone over
13   it with Judge Navarro understanding what was going on
14   with respect to the disciplinary proceedings and also
15   with respect to the two judges who had banned him and
16   kind of the basis for that decision, and everything
17   else.
18           CHAIRPERSON MIMS:  Alright, alright, thank
19   you.
20           MR. KLAYMAN:  May I take two minutes and
21   go to the restroom?
22           CHAIRPERSON MIMS:  Yes, sure.  Let's go

EXHIBIT 4

 BOARD ON PROFESSIONAL RESPONSIBILITY

April 15, 2019

J.P. Szymkowicz, Esquire
Szymkowicz & Szymkowicz, LLP
P.O. Box 57333
Washington, D.C. 20037-0333

Robert C. Bernius
*Chair*

Matthew G. Kaiser
*Vice Chair*

Mary Lou Soller
Billie LaVerne Smith
David Bernstein
Lucy Pittman
Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
*Board Members*

James T. Phalen
*Executive Attorney*

      Re:      Porter Complaint

Dear Mr. Szymkowicz:

    I have reviewed your complaint against Deputy Disciplinary Counsel Julia L. Porter, including your request that the Board's Executive Attorney be appointed as Special Disciplinary Counsel to investigate Ms. Porter's conduct during the investigation and prosecution of Bar Docket Nos. 2005-D179 (John T. Szymkowicz) & 2007-D050 (John P. Szymkowicz). Please note that D.C. Bar R. XI, § 19(a) provides that Disciplinary Counsel and all assistants and employees are immune from disciplinary complaint. The rule states, in pertinent part:

> Members of the Board, its employees, members of Hearing Committees, Disciplinary Counsel, and all assistants and employees of Disciplinary Counsel, all persons engaged in counseling, evaluating or monitoring other attorneys pursuant to a Board or Court order or a diversion agreement, and all assistants or employees of persons engaged in such counseling, evaluating or monitoring shall be immune from disciplinary complaint under this rule and from civil suit for any conduct in the course of their official duties.

*See In re Nace*, 490 A.2d 1120, 1124 (D.C. 1985) (recognizing that Disciplinary Counsel has immunity from disciplinary complaints arising from activities within the scope of his or her duties).

    Because your complaint involves alleged misconduct occurring in the course of Deputy Disciplinary Counsel Porter's official duties, she is immune from disciplinary complaint. I am therefore precluded under

*430 E Street NW, Suite 138, Washington, DC 20001 ▪ 202-638-4290, FAX 202-638-4704*

D.C. Bar Rule XI, § 19(a) from referring your allegations for investigation.

The Board, however, may conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel.   We will undertake such a review in this case.

Sincerely,

Robert C. Bernius,
Chair

cc:   Hon. Anna Blackburne-Rigsby, Chief Judge
Hamilton P. Fox, III, Esquire
James T. Phalen, Esquire

2

EXHIBIT 5



# OFFICE OF DISCIPLINARY COUNSEL

**Hamilton P. Fox, III**
*Disciplinary Counsel*

**Julia L. Porter**
*Deputy Disciplinary Counsel*

*Senior Assistant Disciplinary Counsel*
Myles V. Lynk
Becky Neal

*Assistant Disciplinary Counsel*
Hendrik deBoer
Jerri U. Dunston
Ebtehaj Kalantar
Jelani C. Lowery
Sean P. O'Brien
Joseph C. Perry
William R. Ross
Clinton R. Shaw, Jr.
H. Clay Smith, III
Caroll Donayre Somoza
Traci M. Tait

*Senior Staff Attorney*
Lawrence K. Bloom

*Staff Attorney*
Angela Walker

*Manager, Forensic Investigations*
Charles M. Anderson

*Investigative Attorney*
Azadeh Matinpour

*Intake Investigator*
Melissa Rolffot

June 26, 2020

United States District Court
  for the Northern District of Texas
1100 Commerce Street, Room 1452
Dallas, TX 75242

               Re: *In re Larry Klayman*
                  DCCA No. 18-BG-0100
                  Disciplinary Docket No. 2008-D048
                  <u>NOTICE OF SUSPENSION</u>

To Whom It May Concern:

Enclosed please find a copy of an order of the District of Columbia Court of Appeals disciplining the above-named attorney. Our records reflect that Respondent is also licensed to practice law in the United States District Court for the Northern District of Texas.

If you require additional documents regarding this disciplinary matter, please do not hesitate to contact me at (202) 638-1501. *<u>Please note, we can only accept expedited deliveries via USPS express mail</u>.*

           Sincerely,

           /s/ Lawrence K. Bloom
           Senior Staff Attorney

LKB/his

Enclosure:   DCCA Court Order for *In re Larry Klayman*
                Disciplinary Docket No. 2008-D048

OFFICE OF DISCIPLINARY COUNSEL

MAR 2 9 2019

RECEIVED





**J.P. Szymkowicz**
**Szymkowicz & Szymkowicz, LLP**
**P.O. Box 57333**
**Washington, DC  20037-0333**
**(202) 862-8500**
**jp@szymkowicz.com**

March 29, 2019

The Honorable Anna Blackburne-Rigsby
Chief Judge
District of Columbia Court of Appeals
430 E Street N.W.
Washington, DC  20001

Robert C. Bernius, Esquire
Chairperson
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

James T. Phalen, Esquire
Executive Attorney
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

Hamilton P. Fox, III, Esquire
Disciplinary Counsel
District of Columbia Office of Disciplinary Counsel
Building A, Suite 117
515 Fifth Street, N.W.
Washington, DC  20001

      Re:  Complaint Against Deputy Disciplinary Counsel Julia L. Porter based upon
      her Actions and Inactions in Prosecuting Bar Docket #2007-D050 (In the Matter
      of J.P. Szymkowicz)

Dear Chief Judge Blackburne-Rigsby, Mr. Bernius, Mr. Phalen and Mr. Fox:

      This is a letter of complaint against Deputy Disciplinary Counsel Julia L. Porter
that arises out of her conduct during her investigation and prosecution of my father,

John T. Szymkowicz, and me, that began with a bar complaint filed on May 24, 2005, continued with Disciplinary Counsel's filing of a Specification of Charges dated March 30, 2009,[1] and ended on November 23, 2018, with the expiration of Disciplinary Counsel's time to file a motion for *en banc* review of the *per curiam* opinion of the District of Columbia Court of Appeals accepting the Board on Professional Responsibility's conclusion that my father and I did not violate the Rules of Professional Conduct.  This case lasted for 13 years, 6 months and 30 days.

I ask that the Board on Professional Responsibility appoint Mr. Phalen, as the Executive Attorney, to "act as Special Disciplinary Counsel" pursuant to Rule XI, Section 7 (a) (8) of the Rules Governing the District of Columbia Bar, and investigate this matter pursuant to Rule XI, Section 8 (a) of the Rules Governing the District of Columbia Bar in order to avoid the conflict of interest that would result if the Office of Disciplinary Counsel were to investigate this matter.

## I.     BACKGROUND OF ACKERMAN LITIGATION AND DISCIPLINARY COUNSEL'S SPECIFICATION OF CHARGES.

Ms. Porter's prosecution of my father and me was based on my law firm's representation of Dr. Stephen J. Ackerman, Jr. and his mother, Genevieve Ackerman, with regard to a "Revocable Trust" established on May 21, 2002.  Hearing Committee's Findings of Fact 8.  Mrs. Ackerman and her husband, Stephen Ackerman, Sr., had two children, Mrs. Abbott and Dr. Ackerman.  Ms. Abbott, "took the lead in establishing the trusts for her parents by engaging the services of [Tas Coroneos, an attorney who is now working as a real estate agent in Florida], who drafted the documents and supervised their execution." *Id.  See also* https://www.taspowerof2.com.  "Mrs. Abbott signed [the trust documents] on behalf of both of her parents as their attorney-in-fact pursuant to Powers of Attorney in favor of Mrs. Abbott." *Id.*

Beginning in 2002, my law firm represented Dr. Ackerman in the District of Columbia Superior Court in his effort to "reform the trust to [Mrs. Ackerman's intent]," but the Superior Court ruled against Dr. Ackerman. *Id.* at 10.  My law firm also represented Mrs. Ackerman by filing an action in the Superior Court "for the purpose of revoking the trust and returning control of the trust assets to Mrs. Ackerman." *Id.* at 10-11.  After the trustee's counsel notified my father that he intended to call my father as a witness during the trial in Mrs. Ackerman's case, my father was forced to withdraw as Mrs. Ackerman's counsel pursuant to Rule 3.7 of the District of Columbia Rules of Professional Conduct, and successor counsel, Leslie Silverman, began representing Mrs. Ackerman. *Id.* at 11.  My law firm continued, however, to represent Dr. Ackerman in a proceeding brought by the trustee in the Superior Court to transfer a home on North

---

[1]     Pursuant to the Rules Governing the District of Columbia Bar, Ms. Porter verified the Specification of Charges dated March 30, 2009 by stating "I do affirm that I verily believe the facts stated in the Specification of Charges to be true."

Carolina Avenue into Mrs. Ackerman's trust.  *Id.*  Ultimately, Mrs. Ackerman and Dr. Ackerman lost in all of the actions filed in the Superior Court.  *Id.* at 11-12.

In a 35-page Specification of Charges dated March 30, 2009, Ms. Porter charged my father and me with several violations of the Rules of Professional Conduct, which the Hearing Committee summarized as follows:

> Bar Counsel charges that, during their representation of Mrs. Ackerman, Respondents engaged in conflicts of interest, dishonesty, fraud, and other ethical violations . . . Bar Counsel's prosecution rests on the contention that Mrs. Ackerman is 'incompetent' because she suffers from dementia, 'cognitive impairment' and 'memory problems,' and therefore was mentally incapable of hiring or directing a lawyer, and was unable to understand or process anything of a complex nature.  Bar Counsel asserts that Mrs. Ackerman was an unknowing party to litigation that was brought in her name, because it was not in her interest.  Instead, Bar Counsel argues that the litigation was intended only or primarily to benefit her son, Dr. Ackerman, to Mrs. Ackerman's financial detriment.  These contentions were initiated and are primarily supported by the testimony of Bar Counsel's complaining witness, Mrs. Abbott.  *Hearing Committee's Findings of Fact 12-13.*[2]

> Moreover, the Hearing Committee found that there was a "close connection between the case Mrs. Abbott prepared for Bar Counsel to support Mrs. Abbott's complaints and the case Bar Counsel actually presented against Respondents."  *Hearing Committee's Findings of Fact 18-19.*

## II.     SUMMARY OF DISCIPLINARY PROCEEDINGS.

### A.     Proceedings Before the Hearing Committee.

The proceedings before the Hearing Committee began on October 13, 2009, and ended after 12 days of testimony on March 10, 2010.  The Hearing Committee's Findings of Fact and Proposed Recommendations of Law, which were issued on September 28, 2012, covered 161 pages, not including a 62-page appendix that cited to evidence introduced during the proceedings.  The Hearing Committee that:

---

[2]     The Hearing Committee found that "Mrs. Abbott's anger and resulting hostility to Respondents makes her *opinion* [emphasis in original] testimony against Respondents unreliable."  Hearing Committee's Findings of Fact 21.  Moreover, the Hearing Committee found that "Mrs. Abbott's hostile, bitter statements and uncorroborated testimony cannot be accepted as reliable or even relevant evidence against Respondents."  *Id.*

¶306.  The Hearing Committee has listened to arguments and testimony for twelve hearing days, carefully reviewed over 3,800 pages of transcript (including the two pre-hearing conferences) and several more thousand pages comprising the 228 exhibits admitted in evidence, and considered the arguments set forth in the approximately 300 pages of briefs submitted by the parties.  This careful review enables us to say, with confidence, that **there is no credible evidence, much less clear and convincing evidence, supporting any of Bar Counsel's charges**.  [emphasis added].

. . .

¶307.  It is easy to understand why Mrs. Ackerman yearned for peace in her family. Throughout the years described in this record, there was no peace in the Ackerman family. It is also easy to understand Mrs. Abbott's anger at the situation with which all participants in this tragic drama were faced. The palpable anger and resulting hostility of Mrs. Abbott towards the Respondents is misplaced, however.

¶308.  We do not contest her right to express her opinions on any topic of her choosing, including the behavior of Respondents. However, that anger should not have affected Bar Counsel's investigation in this matter. It is nevertheless clear that Mrs. Abbott's "case" against the Respondents became Bar Counsel's "case" against Respondents.[3] Bar Counsel asked Mrs. Abbott to attest to the truthfulness of her complaining letters.  But Bar Counsel's charges were substantially undermined by Mrs. Abbott's hostility and bias against Respondents, as clearly demonstrated in Mrs. Abbott's cross-examination. Further, Bar Counsel's serious misunderstanding of District of Columbia law with respect to mental capacity and consequently her failure to show that Mrs. Ackerman lacked capacity to interact with Respondents requires that the charges be dismissed against all Respondents, [expect for the Rule 1.5 violation by Mrs. Ackerman's subsequent counsel, Robert King]. *Findings of Fact 155-56.*

---

[3]     In an email dated November 8, 2008 at 10:31 p.m. from Mrs. Abbott to Ms. Porter, Mrs. Abbott describes her filing of an ethics complaint about an accountant in order to obtain information instead of "go[ing] to court to force the issue."  In response to that ethics complaint, Mrs. Abbott's counsel "very soon heard from [the accountant's counsel], we made our demands, and everything we requested has been provided."  Mrs. Abbott's email concludes by stating, "So thank you, Julia, for what I have learned. I figure I saved over $8,000 by filing an ethical complaint as opposed to going back to court – probably even more.  Til later, thanks again – Fran."

**B.      Proceedings Before the Board on Professional Responsibility.**

The Board on Professional Responsibility, in a 35-page opinion issued on July 25, 2014, dismissed all charges against my father and me.  The Board found that "[d]espite the *quantity* of evidence urged by Bar Counsel, when we account for the Hearing Committee's *qualitative* credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents."  [italics in original].  *Opinion* 3.  The Board also found that "[a]lthough Bar Counsel decries as 'almost philosophical' some of the legal issues discussed by the Hearing Committee, there is no meaningful challenge to the germane legal reasoning contained in the Committee's report."  *Opinion* 3.  The Board found that I "never interacted personally with Mrs. Ackerman."  *Opinion* 16.  The Board further observed that:

> Denigrating the Hearing Committee's rejection of its evidence, Bar Counsel aggressively criticizes its 'failure to consider much, if not most, of the evidence' or 'even to acknowledge it,' and characterizes this purported failing as a 'dereliction of [its] responsibility.'  (Bar Counsel's Brief before the Board at 48-49).  The *ad hominem* attack on the Hearing Committee's work product is unfortunate. The Hearing Committee did consider countervailing evidence (see, e.g. Hearing Committee's Findings of Fact at 79-93).  The fact that it did not swell its report beyond 219 pages, further to detail evidence it found unpersuasive, does not mean the Committee ignored it."  *Opinion 17*.

The Board, with regard to me, found that:

> [W]e reject Bar Counsel's claim that J.P. Szymkowicz violated Rule 1.7 (b)(2) for an additional reason.  Although he appeared on behalf of Mrs. Ackerman in the litigation, his role was entirely secondary to his father's. He never spoke to Mrs. Ackerman.  He had no reason to discuss any conflict issues with her because his father had 'satisfied any inquiry he had about that.  His father had a demonstrated history of being sensitive to, and vetting, conflicts in the past.  J.P. Szymkowicz understood that his father would 'not do anything on behalf of his clients unless they understand what's going on, and the ramifications of what they are going to do.  If there is a potential conflict, any potential conflict, . . . he's very, very thorough and takes sometimes hours discussing these kind of issues with clients, and that happens in every case.'  J.P. Szymkowicz was entitled to rely on [John T. Szymkowicz's] determination of Mrs. Ackerman's capacity.  He neither knew of, nor ratified, any improper conduct of his father.  As a consequence, he did not have disciplinary liability for any failure of his father in that regard.  [*citing* D.C. Bar Rule of Professional Conduct 5.1, Comment 6].  *Opinion 27*.

**C.      Proceedings Before the Court of Appeals.**

In a 27-page *per curiam* opinion issued on September 17, 2015, the Court of Appeals dismissed all charges against my firm, except that it remanded the case to the Board on Professional Responsibility for "further consideration of the conflict-of-interest charges" because "the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained." *Opinion 21-22, 27.* The Court of Appeals further found that:

> The Board ruled in the alternative that Mr. J.P. Szymkowicz did not violate the conflict-of-interest rule because he reasonably relied on Mr. J.T. Szymkowicz's assurances that any conflict issues had adequately been addressed. Because it is possible that the Board's assessment of that issue could be affected by the Board's determinations on remand, we also remand as to the conflict-of-interest charge against Mr. J.P. Szymkowicz. *Opinion 22 n.2.*

**D.      Proceedings on Remand Before the Board on Professional Responsibility.**

On May 19, 2017, the Board on Professional Responsibility issued a 36-page report and recommendation on remand from the Court of Appeals. This report, after a lengthy discussion of the law on capacity and burdens of proof, found that "Disciplinary Counsel failed to prove by clear and convincing evidence that the Szymkowiczes failed to obtain informed consent pursuant to Rule 1.7 (c) after [John T. Szymkowicz] offered evidence of informed consent." *Report 23.* This report also finds that "[b]ased on this conclusion, we also see no reason to revisit our previous finding that [J.P. Szymkowicz] reasonably relied on his father's assurances that he had obtained Mrs. Ackerman's informed consent under Rule 5.2 (subordinate lawyers)." *Report 25.* Thus, the Board "recommends that the case against the Szymkowiczes be dismissed." *Report 35.*

**E.      Proceedings in the Court of Appeals after Remand to the Board on Professional Responsibility.**

On November 8, 2018, the Court of Appeals held, in a 16-page opinion, that the record supports the Board's conclusion that Disciplinary Counsel failed to carry the burden of proving by clear and convincing evidence that Mrs. Ackerman did not give informed consent to my firm's representation. With regard to me, the Court found that:

> Although John P. Szymkowicz did not personally discuss conflicts of interest with Ms. Ackerman, the Board concluded that John P.

Szymkowicz reasonably relied upon assurances from his father on the issue.  We do not understand Disciplinary Counsel to argue at this juncture that John P. Szymkowicz violated Rule 1.7 even if his father did not.  *Opinion 6-7.*

## III.    MRS. ABBOTT'S COUNSEL NEVER ASKED A COURT TO IMPOSE SANCTIONS DURING LITIGATION AND NEVER FILED A BAR COMPLAINT.

During the litigation of the cases underlying this disciplinary proceeding, Mrs. Abbott's counsel, George Huckabay, never asked a court to impose sanctions for frivolous behavior and did not file a bar complaint to Disciplinary Counsel as he was required to do under Rule 8.3 (a) of the Rules of Professional Conduct if he believed that my father or I committed a disciplinary violation.  Rule 8.3 (a) states:

A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

Mr. Huckabay also did not testify against me or my father during the proceedings before the Hearing Committee, even though he had numerous dealings with my father in the various cases involving Dr. Ackerman and Mrs. Ackerman.  Had he testified before the Hearing Committee, Mr. Huckabay would have testified that he never had a substantive discussion about the Ackerman matters with me, and that his interactions with me were limited to such things as asking to speak with my father or communications on non-substantive matters, such as when documents would be produced or what days were good for scheduling purposes.

## IV.    MS. PORTER'S ACTIONS THAT VIOLATE THE RULES OF PROFESSIONAL CONDUCT.

### A.    Ms. Porter's Four Year Investigation of the Charges against My Law Firm.

Ms. Porter's initial investigation of the facts surrounding Mrs. Abbott's bar complaint lasted between May 24, 2005, when the complaint was made, and March 30, 2009, when she filed the Petition Instituting Formal Disciplinary Proceedings with the Board on Professional Responsibility.  During the entire time that this action was pending, six central witnesses in this case died, including Genevieve Ackerman, who was the key figure in the drama; Stephen J. Ackerman, Sr., her husband; Herbert Callihan, her attorney prior to the time my law firm represented her; Kenneth Loewinger, her court-appointed attorney after my firm's representation of her ended; George Huckabay, her daughter's attorney in all of the proceedings in which my firm represented Ms. Ackerman and her son; and finally, her son, Stephen J Ackerman, Jr.

By the time the Hearing Committee began its 12 days of hearing, Mrs. Ackerman was unable to testify on my firm's behalf due to injuries she suffered in a fall in 2007, and Stephen J. Ackerman, Sr. and Mr. Callihan were dead.  By the time my firm began its defense before the Hearing Committee on December 1, 2009, Mr. Loewinger had died as well.  Melvin Bergman, the attorney for Co-Respondents Leslie Silverman and Robert King, died prior to the final resolution in the Court of Appeals.

The result of Ms. Porter's almost four-year delay in filing her Petition Instituting Formal Disciplinary Proceedings was that my firm did not have the ability to call witnesses (including Mrs. Ackerman herself) who would have corroborated my father's testimony that Mrs. Ackerman possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  Instead, the Hearing Committee was not able to hear from those individuals, and thus, as a result of Ms. Porter's delay, my father could defend himself against Ms. Porter's allegations by calling only three witnesses besides my father and me to testify before the Hearing Committee:  Dr. Richard Ratner, who evaluated Mrs. Ackerman as a psychiatrist, and Mrs. Ackerman's successor counsel, Leslie Silverman and Robert King.  Had proceedings before the Hearing Committee began within a few months of Ms. Porter receiving Mrs. Abbott's bar complaint in May 2005, the Hearing Committee would have heard directly from Mrs. Ackerman and determined for themselves that she possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  If testimony from Mrs. Ackerman was not enough to exonerate my law firm, my father would have also called Herbert Callihan, who was Mrs. Ackerman's previous attorney, and Kenneth Loewinger, her court-appointed counsel, to testify as to Mrs. Ackerman's capacity, wishes and informed consent to my father's legal strategy.  Instead, Ms. Porter's four-year delay in bringing this case to trial left my father with no "third-party" witness except for Dr. Ratner to corroborate my father's testimony.

I believe that the evidence is clear that Ms. Porter used delay as a procedural weapon against my law firm since she "ran out the clock" on Mrs. Ackerman's ability to recall facts and events (Mrs. Ackerman was almost 88 years old in May 2005, when Mrs. Abbott first complained to the Disciplinary Counsel about my law firm) by waiting almost four years to file her Petition Instituting Formal Disciplinary Proceedings.  It is not difficult to imagine that an 88-year-old's memory of detailed facts related to legal proceedings would fade after four years.  In fact, by the time the Hearing Committee heard the case in late-2009, Mrs. Ackerman had fallen (sometime in 2007), and apparently, lost much, if not all, of her ability to remember simple day-to-day details of her life, and thus, Mrs. Ackerman was therefore unable to testify before the Hearing Committee.  This extensive delay significantly prejudiced my firm's defense against Ms. Porter's charges.

In "*Lowering the Bar:  How Lawyer Discipline in New York Fails to Protect the Public*," 17 N.Y.U. J. Legis. & Pub. Pol'y 485, 496 (2014), Professor Stephen Gillers of the New York University Law School, states that an "[u]nacceptable delay" "undermines the goals of discipline" and provides the following example of an "unconscionably long" delay – "Imagine misconduct in year one, charges in year two, and suspension from practice or disbarment in year four.  A lawyer who deserves suspension will have been able to practice for three years after the misconduct that supports the suspension or disbarment."  It is important to again note that Ms. Porter waited almost four years to file the Petition Instituting Formal Disciplinary Proceedings, and during this long period of time, Mrs. Ackerman's memory faded with advanced age and other witnesses died.

Should Ms. Porter claim that she waited to file the Petition Instituting Formal Disciplinary Proceedings until the conclusion of all of the proceedings involving Mrs. Ackerman, I urge you to consider the American Bar Association Report of the Commission on Evaluation of Disciplinary Enforcement dated September 18, 2018. This report states in the comment section of Recommendation 12 that "A disciplinary case should not be suspended or delayed because of a pending civil or criminal case involving the same facts except upon a determination by the state disciplinary board that good cause exists to do so, consistent with [the ABA Model Rules for Lawyer Disciplinary Enforcement]."

The  Standing Committee on Professional Discipline of the American Bar Association's Center for Professional Responsibility, in its "2016 Survey on Lawyer Discipline Systems," found at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/2016sold_results.pdf, published a Chart, found at Chart VI, entitled "Case Processing Times."  This chart published the number of days it took for a particular disciplinary case to proceed through the system at different stages of the process for most of the jurisdictions in the United States.  One chart that is relevant to my case is the "Average Time from Receipt of Complaint to Filing of Formal Charges."  Most states accomplish this goal within a year; only six states reported times greater than one year.  Ms. Porter took almost four years to file formal charges against my father and me.

Ms. Porter, on page 16 of Disciplinary Counsel's March 29, 2018 brief to the Court of Appeals, cavalierly treats my law firm's delay and due process arguments:

The charges in this case were submitted in March 2009, six months before the Szymkowiczes stopped litigating against Ms. Ackerman's trust. Disciplinary matters take time to resolve, particularly when years elapse over the course of the hearing, the Committee's report, the Board report, and the appeal.  . . . They have been permitted to practice law during the entire period these matters were pending and a sanction for their misconduct has yet to be imposed.  . . . Their complaint about the expense also has no place in this appeal.  They chose to retain counsel.

9

I believe that the evidence is clear that Ms. Porter used delay as an offensive weapon against my law firm in order to run out the clock on my firm's ability to call Mrs. Ackerman and others as witnesses during the proceedings before the Hearing Committee.

### 1.     Ms. Porter's November 2005 interview with Mrs. Ackerman.

In 2005, after receiving Ms. Porter's request for information about Mrs. Ackerman's case, my father invited and encouraged Ms. Porter to meet with Mrs. Ackerman, outside of the presence of my father and her son, Stephen J. Ackerman, Jr., so that Ms. Porter could hear directly from Mrs. Ackerman what the elderly woman wanted and what information my father had provided to Mrs. Ackerman with regard to the course of action ultimately undertaken by my law firm.  Upon information and belief, Ms. Porter and an investigator from the Office of Disciplinary Counsel met with Mrs. Ackerman in November 2005 as suggested by my father.  This meeting is significant because one of two things occurred at that time, either:  (1) Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent to the plan for litigation that my father employed, or (2) Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, and thus, could not provide informed consent to my father's litigation plan.  If Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent of the plan for litigation that my father employed, Ms. Porter's investigation should have ended there.  If Ms. Porter found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, she had the duty to immediately file a Petition Instituting Formal Disciplinary Proceedings, rather than waiting more than three years - until March 30, 2009 - to do so, in order to protect Mrs. Ackerman from further harm and to protect the general public from an unethical attorney.

### a.     Ms. Porter should have recused herself from prosecuting her case against my father and me based on the fact that she interviewed Mrs. Ackerman.

Once Disciplinary Counsel filed the Petition Instituting Disciplinary Proceedings, Ms. Porter should have recused herself under Rule 3.7 of the Rules of Professional Conduct (which requires lawyers to recuse themselves if they are likely to be a necessary witness during trial) so that she and her investigator could have testified against my father in the proceedings before the Hearing Committee (assuming that she found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions).  While Ms. Porter called many witnesses before the Hearing Committee to testify generally about Mrs. Ackerman's purported incapacity, she did not testify herself or call her investigator to testify.  This omission is glaring because if she or her investigator had believed that Mrs. Ackerman lacked capacity to understand the nature

and effect of her actions, based on their November 2005 meeting with the central figure
in this case, surely Ms. Porter would have introduced this evidence during the
proceedings before the Hearing Committee.  The obvious answer is that Ms. Porter and
her investigator did not find that Mrs. Ackerman lacked capacity to understand the
nature and effect of her actions during their interview, and rather, found Mrs. Ackerman
to be, as my father testified, steadfast in her desire to take the actions suggested by my
father after he provided her with information that was sufficient to allow her to provide
informed consent to this plan of action.

### B.     Ms. Porter's Failure to Dismiss the Case Against Me after the Hearing Committee Issued its Report and Recommendations in September 2012.

While Mrs. Abbott did not originally include me in her May 24, 2005 bar complaint
against my father, she later filed a separate bar complaint against me on February 12,
2007.  In response to that bar complaint, I sent Ms. Porter a letter on March 28, 2007
that rebutted each and every statement in Mrs. Abbott's February 12, 2007 complaint
against me.  This letter detailed what I did - and what I did not do - with respect to the
various proceedings in the Ackerman cases.  The Hearing Committee found that "JPS
had a limited role with respect to in-person meetings with both Dr. Ackerman and Mrs.
Ackerman and with respect to appearing in court in all relevant matters for those clients.
*Findings of Fact 94*.  The Hearing Committee cited Rule 5.2 of the Rules of Professional
Responsibility in its Findings of Fact:

¶191.  Rule 5.2 governs the responsibilities of subordinate lawyers.  In its
entirety, Rule 5.2 states:

(a)     A lawyer is bound by the Rules of Professional Conduct
notwithstanding that the lawyer acted at the direction of another
person.

(b)     A subordinate lawyer does not violate the Rules of
Professional Conduct if that lawyer acts in accordance with a
supervisory lawyer's reasonable resolution of an arguable question
of professional duty.

Comment (2) to Rule 5.2 further provides:

When lawyers in a supervisor-subordinate relationship encounter a
matter involving professional judgment as to ethical duty, the
supervisor may assume responsibility for making the judgment.
Otherwise a consistent course of action or position could not be
taken. If the question can reasonably be answered only one way,
the duty of both lawyers is clear and they are equally responsible
for fulfilling it. However, if the question is reasonably arguable,

11

someone has to decide upon the course of action. That authority ordinarily reposes in the supervisor, and a subordinate may be guided accordingly. *For example, if a question arises whether the interests of two clients conflict under Rule 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.* [*italics in original*].

. . .

¶193.  Thus, JPS was entitled to rely on the judgment of JTS as to whether Mrs. Ackerman had validly waived the conflict of interest with Dr. Ackerman, so long as JTS' resolution of that issue was 'reasonable' which we have found to be the case.  JPS was therefore entitled to rely on JTS' resolution of that issue.  *Findings of Fact 97-98*.

After the Hearing Committee issued its Findings of Fact, Ms. Porter had a duty to dismiss me from the proceedings unless she could prove that my reliance on my father's resolution of the issue that Mrs. Ackerman waived the conflict of interest with her son was "unreasonable."  Rather than dismissing me from the proceedings, Ms. Porter filed Exceptions to the Hearing Committee's Findings of Fact and Conclusions of Law before the Board on Professional Responsibility, Exceptions to the Board's Order before the Court of Appeals, a Brief before the Board on Professional Responsibility on remand, and finally, a brief before the Court of Appeals after remand to the Board on Professional Responsibility.

On pages 42 to 45 of Disciplinary Counsel's brief before the Court of Appeals dated December 12, 2014, pages 22 to 23 of Disciplinary Counsel's Brief on remand to the Board on Professional Responsibility dated November 23, 2015 and pages 15 to 16 of Disciplinary Counsel's brief before the Court of Appeals dated March 29, 2018, Ms. Porter attempted to address, the reasonableness of my reliance on my father's belief that Mrs. Ackerman had capacity to understand the nature and effect of her actions and that my father had obtained Mrs. Ackerman's consent to the legal strategy employed. Instead of discussing whether my reliance on my father's statements to me about the Ackerman litigation was reasonable or not, Ms. Porter made arguments such as "[J.P. Szymkowicz] took no steps to ascertain that his father had made the necessary disclosures, or that Mrs. Ackerman understood and appreciated her risks and alternatives" and "[w]ith access to the medical reports and Ms. Ackerman's testimony showing her cognitive and memory deficits, [J.P. Szymkowicz] cannot escape responsibility for knowing of her compromised condition," ," *Disciplinary Counsel's December 12, 2014 Brief to Court of Appeals 45*; *Disciplinary Counsel's March 29, 2018 Brief to Court of Appeals 16*.

The transcript of the proceedings before the Hearing Committee shows that there was extensive testimony that concerns (a) my reliance on my father's statements that Mrs. Ackerman was competent [*See Tr. 1671, 1770-1771*], (b) my reliance on my father's statements that Mrs. Ackerman waived any conflict of interest between her and her son [*See Tr. 1705-1706, 1910-1912*] and (c) my belief of my father's truthfulness based on years of knowing him [*See Tr. 1682-1685, 1910-1912*]. Rather than address Rule 5.2, concerning the responsibility of "subordinate lawyers," Ms. Porter attempted to "lump" me in with my father with regard to distinct acts in which he allegedly participated in order to "keep me in the case."

### 1.    Ms. Porter's false statements to the Board on Professional Responsibility and the Court of Appeals that were made to "keep me in the case."

Ms. Porter made false statements to the Board on Professional Responsibility and the Court of Appeals about what I did (or did not do) that had no support in the record whatsoever. Ms. Porter made these false statements with the purpose of clouding the issue of what specifically I did or did not do and did so in an effort to have the Board and Court punish me, in addition to my father, in case he was found to have committed violations of the Rules of Professional Conduct. Ms. Porter's actions to "lump" me  in with my father with regard to his interactions with Mrs. Ackerman did not occur before the Hearing Committee, presumably because the Hearing Committee would have "caught" her in her deception, but did occur during proceedings before the Board on Professional Responsibility and the Court of Appeals (which did not have the detailed recollection of the facts that the Hearing Committee had). For example, before the Hearing Committee, Ms. Porter, used language that did not include me, such as "JTS and SA Jr. induced Mrs. Ackerman to sign a new complaint against Frank Abbott by telling her that it would end the litigation." Disciplinary Counsel's April 19, 2010 Brief to the Hearing Committee 35. Ms. Porter's choice of language in filings before the Board on Professional Responsibility and the Court of Appeals was intentional, in the sense that she had actual knowledge that what she wrote was misleading, at best, or outright false, at worst, and her falsehoods were material to the proceeding, in the sense that she wanted to "exaggerate" my involvement (or lack thereof) in the case to keep me in the case after the Hearing Committee found in my favor. These false statements include:

a.    "the Szymkowiczes had promised Mrs. Ackerman that they would drop the litigation if she revoked the trust." *Disciplinary Counsel's Brief before the Court of Appeals dated December 12, 2014 at 13.* [There is no evidence in the record that I "promised" Mrs. Ackerman anything].

b.    "the other Respondents, Silverman and King – even when they were brought in – first, they were brought in by the Szymkowiczes and the son." *Transcript of June 3, 2015 Oral Argument before the Court of*

*Appeals 13*.  [There is no evidence in the record that I "brought in" Ms. Silverman or Mr. King].

c.      "The Szymkowiczes and [Dr.] Ackerman persuaded Ms. Ackerman to sign the complaint initiating Ackerman II, by promising her that her son would dismiss or drop his own case and 'end the litigation.'"  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 12*.  [There is no evidence in the record that I "persuaded" Mrs. Ackerman to do anything].

d.      "The POAs and other documents that the Szymkowiczes had Ms. Ackerman sign in favor of her son also gave rise to conflicts."  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 13*.  [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

e.      "[I]n November 2005, the Szymkowiczes had Ms. Ackerman execute a new POA in favor of her son, as well as other documents including a revocation of her trust, that also benefitted her son."  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 14*.  [There is no evidence in the record that I "had Mrs. Ackerman execute" anything].

f.      "The Szymkowiczes first assisted the son in filing a lawsuit, to dispute the trust and secure one of the properties for himself, despite the clause disinheriting beneficiaries who challenged the trust.  Three years later they undertook to represent his mother at the same time, promising that her son would drop his suit if she litigated to under to trust herself."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 2-3*.  [There is no evidence in the record that I ever "promised" Mrs. Ackerman anything].

g.      "The Szymkowiczes secured other POAs in the son's favor on November 22, 2005, and then repeatedly had his mother execute new POAs in his favor over the next 15 months."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 10*.  [There is no evidence in the record that I "secured" any document from Mrs. Ackerman].

h.      "One or both Szymkowiczes took part in many of these communications [with successor counsel Leslie Silverman and Robert King]."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15*.  [There is no evidence in the record that I "took part" in any substantive "communications" with Ms. Silverman or Mr. King].

i.      "None of the lawyers discussed the documents [Mrs. Ackerman's new will and an assignment of assets to Dr. Ackerman] with her, or the risks, alternatives, or implications of signing them.  They gave them to her son, informing him that he could sign the Assignment for her under authority of a POA."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15*.  [There is no evidence in the record that I "gave" Dr. Ackerman a copy of Mrs. Ackerman's will or assignment of assets or "informed" him that he could sign the Assignment to her under authority of a POA].

j.      "in November 2007, Stephen Ackerman, Jr. tried an almost opposite approach – with cooperation from all four lawyers.  After contacting the D.C. Agency on Aging, he petitioned the Probate Court for appointment as his mother's guardian and conservator because she was incapacitated (he claimed, as a result of macular degeneration, but he verified that she lacked capacity to care for herself or to obtain, administer or dispose of property and income)."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 18-19*.  [There is no evidence in the record that I "cooperated" with Stephen Ackerman, Jr. in "contacting the D.C. Agency on Aging or "petitioning" the Probate Court].

k.      "The record evidence does not support the Board's finding that the Szymkowiczes ended their representation of Ms. Ackerman on March 7, 2017 – the day JTSzymkowicz and Silverman filed a praecipe in Ackerman II substituting the latter for the former as Ms. Ackerman's counsel in the litigation.  Rather, clear record evidence demonstrated that the Szymkowiczes continued to act as counsel for Ms. Ackerman in their subsequent meetings, and when they prepared legal documents for her to sign that they maintained and used."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 44*.  [There is no evidence in the record that I "prepared legal documents" for Mrs. Ackerman to sign].

l.      "Silverman and King acted in concert with Stephen Ackerman, Jr. and the Szymkowiczes from whom they got their information."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 47*. [There is no evidence in the record that I provided "information" to Ms. Silverman or Mr. King].

m.      "That the Szymkowiczes withdrew as counsel in Ackerman II because Mr. Szymkowicz was going to be a witness.  The assignment was actually signed in August of 2007 which was around the time that Mr. Szymkowicz or the Szymkowiczes created the document."  *Timestamp*

*14:32 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I "created" this assignment].

n.      "I think there's more than clear and convincing evidence in the record, particularly from the perspective of Ms. Ackerman, who, while the Szymkowiczes may - who withdrew as counsel in the Ackerman II case, continued to be involved in every legal matter that she – going forward.  It was basically a seamless, I guess, representation as far as Ms. Ackerman was concerned." *Timestamp 25:38 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I was "involved" in Stephen Ackerman, Jr.'s Petition for Guardianship of Mrs. Ackerman, Probate Intervention Case Number 407-07. Stephen Ackerman, Jr. originally filed this Petition *pro se*, but later retained Claude Roxborough, Esquire as his counsel in this proceeding].

o.      "The power of attorney.  Her daughter had been taking care of all of her needs, all of her financial obligations since her stroke in the late nineties.  This was going to change things dramatically.  And, again, no disclosure, no explanation about the risk, the alternatives, so it didn't give Ms. Ackerman the information that she needed, not only with respect to the litigation, but with respect to the other, I guess, transactions, or documents that the Szymkowiczes had Ms. Ackerman sign." *Timestamp 31:34 of the April 11, 2018 oral argument in the Court of Appeals.*  [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

The result of Ms. Porter's false and misleading statements to the Board on Professional Responsibility and the Court of Appeals is that I was "kept in the case" for six more years after the Hearing Committee found that I "reasonably rel[ied] on JTS's determination of Mrs. Ackerman's capacity and her waiver of any conflict."  Hearing Committee's Findings of Fact and Proposed Conclusions of Law at 101.

**C.      The Investigation into Ms. Porter's Conduct should look into whether Ms. Porter used her Former Colleague, Professor Michael Frisch, and his "Legal Profession Blog" to Tarnish my Law Firm in the Legal Community and Improperly Influence the Board on Professional Responsibility and Court of Appeals (and its Law Clerks) to Side with Disciplinary Counsel against my Law Firm.**[4]

The investigation into Ms. Porter's conduct should look into whether Ms. Porter used her former colleague at the Office of Disciplinary Counsel and current colleague at Georgetown University Law Center, Professor Michael Frisch, to tarnish my law firm's

---

[4]      Printouts of Professor Frisch's blog posts related to this case are attached in the Appendix attached to this letter.

reputation in the legal community and improperly influence the Board on Professional Responsibility and Court of Appeals (and its law clerks) to side with Disciplinary Counsel against my law firm.  Professor Frisch publishes an influential "Legal Profession Blog," found at https://lawprofessorstypepad.com/legal_profession. Professor Frisch and Ms. Porter are both adjunct professors of law at the Georgetown University Law Center who teach courses in professional responsibility. *https:www.law.georgetown.edu/faculty/michael-s-Frisch/* and *https:www.law.georgetown.edu/faculty/julia-l-porter/.*

I do not recall that Professor Frisch attended any of the proceedings before the Hearing Committee in my case; accordingly, he would not have had the personal knowledge sufficient to provide any "color" to the reporting on my case that he provided on his blog.  The statements he published in his blog about my case provided a "slanted" view against my firm and in favor of Mrs. Abbott and Ms. Porter, and it would have been virtually impossible for him to have come to the conclusions that he made based on a reading of the Hearing Committee's Findings of Fact and Conclusions of Law alone.

In an article published on Professor Frisch's blog on August 17, 2018 entitled "D.C. Disciplinary Counsel has New Leadership," Professor Frisch stated:

> The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.  With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.  Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts. . . . Disclosure: Deputy Porter and I were colleagues at Bar Counsel for a decade, regularly co-counseled cases and have co-taught ethics courses at Georgetown Law for many years.  **I am biased in her favor**.  [emphasis added].

An investigation into Ms. Porter's conduct in my case might also consider looking into whether Ms. Porter was connected to an article published in the Summer 2014 issue of the Georgetown Journal of Legal Ethics entitled "Clients with Diminished Capacity Seek Attorneys with Augmented Integrity" by Georgetown Law student Liza Magley.  *27 Geo. J. Legal Ethics 705*.

### 1.    Professor Frisch's October 22, 2012 Blog Post.

The first article that Professor Frisch wrote about my case is "The Worst Hearing Committee Report in D.C. History," published on his blog on October 22, 2012.  This article states:

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him.  The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations.  In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct.  The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself.  Thus, her entire testimony was ignored due to so-called "bias."
In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family."  Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse.  A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved. The case spanned several years and the opinion is 219 pages.  It is the only case known to the Hearing Committee that squarely deals with the difference between legal competency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment…and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

> **a.     Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post.**

19

Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post when she stated on page 17 of Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018, "The Hearing Committee touted the visibility of this case, to the rest of the bar."

**2.      Professor Frisch's December 24, 2012 Blog Post.**

Professor Frisch's contact with Ms. Porter becomes more likely than not when reading his blog post entitled, "Worst to First" published on December 24, 2012, which stated

> Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.

> With typical understatement, I called the report the worst in D.C. bar history.

> Bar Counsel has appealed the case to the Board on Professional Responsibility.  Hopefully, justice will eventually prevail.

> **a.      Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.**

The reason that it is more likely than not that Professor Frisch and Ms. Porter were in contact about my case is the fact that Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.

**3.      Professor Frisch's July 28, 2014 Blog Post.**

Professor Frisch published another blog on Monday July 28, 2014 (just three days after the Board on Professional Responsibility posted its order dismissing all charges against my firm on Friday July 25, 2014).  This blog post was entitled "Worst Report Affirmed," and stated, in relevant part:

> In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe

were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

. . .

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

. . .

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.

. . .

[T]his is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

### 4.    Professor Frisch's September 17, 2015 Blog Post.

After the Court of Appeals remanded the case to the Board on Professional Responsibility on September 17, 2015, Professor Frisch published a blog post that same day that stated, in relevant part:

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee
Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counterfactual fact findings.

. . .

My review of the record inescapably leads to a contrary conclusion to the findings of a[n] obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

. . .

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

### 5.  Professor Frisch's May 22, 2017 Blog Post.

Professor Frisch published another blog post on May 22, 2017 entitled "The Most Blatant Regulatory Failure in D.C. Bar History Nears A Conclusion."  This blog post stated, in relevant part:

> The seemingly endless saga caused by The Worst Hearing Committee Report in D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.
>
> . . .
>
> In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.
>
> The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.
>
> A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of

her son.  Somehow, and for reasons that escape me, those conclusions did not lead to findings of serious ethical violations.

. . .

Here, in May 2017, the board made true my prediction.  Disciplinary Counsel can appeal this atrocity to the court, which will face the moral dilemma of attempting to honor its fact finding standard of review (deferring to a hearing committee that utterly failed to do its job and a board unwilling to police it) and the undeniable facts that justify the severest discipline.  If there ever was a case in D.C. where the disciplinary system perpetrated a greater injustice and more fully failed in its stated public protection purpose, it has escaped my attention.  For those of sufficiently strong stomach, the report in *In re Szymkowicz*, Szymkowicz, Silverman & King can be accessed through this link [. . .].

### 6.      Professor Frisch's November 8, 2018 Blog Post.

Within a few minutes after the Court of Appeals posted its final opinion in my firm's case on the Court's website on November 8, 2018, Professor Frisch published a blog post that was updated several times over the next few days.  The final post was entitled "District of Columbia Court Absolves Attorneys of Horrific Elder Abuse Conflict." This blog post states:

> The District of Columbia Court of Appeals has in a *per curiam* decision affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system.  As a consequence, attorneys who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.
> A hollow tsk tsk is all the court can muster
>
>> In sum, although we fully understand Disciplinary Counsel's concerns about the Szymkowiczes' conduct in this case, we accept the Board's conclusion that the Szymkowiczes were not shown by clear and convincing evidence to have violated Rule 1.7.
>
> The court majority's "full understanding" offers faint if no hope to future victims. And does nothing to instruct the Bar and public on the ethics of elder care abuse.  Rather, the court's discussion of burden shifting has no practical consequence but to tie the hands of Disciplinary Counsel in proving conflicts.  There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result.

23

. . .

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair . . .

. . .

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.  This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day.

## V.    CONCLUSION.

### A.    Potential Charges Against Ms. Porter.

I believe that the facts support charges that Ms. Porter violated several Rules of the District of Columbia Rules of Professional Conduct, including:

- Rule 3.2 (a), entitled "Expediting Litigation," which states, "In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another."[5]

- Rule 3.1, entitled "Meritorious Claims and Contentions," which states, in relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not

---

[5]    Comment 1 to Rule 3.2 states, "Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client."

frivolous, which includes a good-faith argument for the extension, modification, or reversal of existing law."[6]

- Rule 3.3 (a), entitled "Candor to Tribunal," which states, in relevant part, "A lawyer shall not knowingly:  (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." . . . (4) Offer evidence that the lawyer knows to be false."[7]

- Rule 3.4 (e), entitled "Fairness to Opposing Party and Counsel," which states, in relevant part, "A lawyer shall not: . . . (e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."

- Rule 3.5 (a), entitled "Impartiality and Decorum of the Tribunal," which states, in relevant part, "A lawyer shall not: (a) Seek to influence a judge, juror, prospective juror, or other official by means prohibited by law."

- Rule 3.7 (a), entitled "Lawyer as Witness," which states "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:  (1) The testimony relates to an uncontested issue; (2) The testimony

---

[6]     Comment 1 to Rule 3.1 states, in relevant part, "The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure."  Comment 2 to Rule 3.1 states, in relevant part, that lawyers "are required to inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."

[7]     Comment 2 to Rule 3.3 states, in relevant part, "An assertion purported to be made by the lawyer, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.  There may be circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.  If the lawyer comes to know that a statement of material fact or law that the lawyer previously made to a tribunal is false, the lawyer has a duty to correct the statement."  Comment 3 to Rule 3.3 states, in relevant part, "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal.  A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. . . . The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case."

relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client."

- Rule 3.8, entitled "Special Responsibilities of a Prosecutor," which states, in relevant part, "The prosecutor in a criminal case shall not:  . . . (b) File in court or maintain a charge that the prosecutor knows is not supported by probable cause; (c) Prosecute to trial a charge that the prosecutor knows is not supported by evidence sufficient to establish a prima facie showing of guilt; (d) Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense; (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense upon request any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; [and] (f) Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused."[8]

- Rule 8.4, entitled "Misconduct," which states, in relevant part, "It is professional misconduct for a lawyer to: . . . (c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [and] (d) Engage in conduct that seriously interferes with the administration of justice."

### B.    Information to Seek in an Investigation of Ms. Porter.

I believe that the following information may be relevant in determining whether Ms. Porter violated any Rules of the District of Columbia Rules of Professional Conduct during her prosecution of my case:

- Information concerning the November 2005 meeting between Mrs. Ackerman, on the one hand, and Ms. Porter and her investigator, on the other hand.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott

---

[8]    Comment 1 to Rule 3.8 states, in relevant part, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's first attorney, Herbert Callihan.

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's court-appointed attorney, Kenneth Loewinger.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott's attorney, George Huckabay.

- All communications Ms. Porter and Professor Frisch concerning my case.

### C.    Conclusion.

Thank you for taking the time to review the contents of this letter and I look forward to speaking with your investigators and responding to any request for additional information.

Respectfully submitted,

J.P. Szymkowicz

# APPENDIX

# PROFESSOR FRISCH'S BLOG POSTS

**Professor Frisch's Blog Post**
**"The Worst Hearing Committee Report**
**in D.C. Bar History"**
**October 22, 2012**

Legal Profession Blog

Monday, October 22, 2012

# The Worst Hearing Committee Report In D.C. Bar History

By Legal Profession Prof

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself. Thus, her entire testimony was ignored due to so-called "bias."

In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family." Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal compentency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment..and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.
>
> https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

The title to this post reflects my opinion. It calls to mind one of my favorite Seinfeld lines from Elaine to Jerry: "Just when I think you are the shallowest man I've ever met, you manage to drain a little more out of the pool."

Just when I think these reports can't possibly get any worse, one like this one shows up. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2012/10/the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

**Professor Frisch's Blog Post**
**"Worst to First"**
**December 24, 2012**

# Legal Profession Blog

## A Member of the Law Professor Blogs Network

**Blog Editors**

**S. Alan Childress**
Conrad Meyer III Professor of Law
Tulane Univ. Law School
• achildr[at]tulane.edu
• Website

**Michael S. Frisch**
Ethics Counsel
Georgetown Law Center
• frischm[at]law.georgetown.edu
• Profile

**Jeffrey M. Lipshaw**
Associate Professor of Law
Suffolk Law School
• jlipshaw[at]suffolk.edu
• Profile
• SSRN Author Page

**Contributing Editor**

**Nancy B. Rapoport**
Gordon Silver Professor of Law
William S. Boyd School of Law, UNLV
• nancy.rapoport[at]unlv.edu
• Profile
• SSRN Author Page

**News Readers & Feeds**

FeedBurner Subscription Service



Enter your Email

[                    ]

[Subscribe me!]

Powered by FeedBlitz

*View Recent Posts from Network
Blog Feeds*

**Search This Blog**

[              ] [Search]

« The Trouble With Tribble | Main | No Higher Power »

## December 24, 2012

### Worst To First

Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.

With typical understatement, I called the report **the worst in D.C. bar history.**

Bar Counsel has appealed the case to the Board on Professional Responsibility. Hopefully, justice will eventually prevail.

Well, I have just read another hearing committee report that is the exact opposite -- a thoroughly professional, 201 page analysis of the charges in two matters with a well-reasoned and appropriate recommendation of disbarment.

The main charges involve the attorney's representation of a plaintiff in a sex harassment case.

When the client became concerned about the attorney's behavior (in particular, his disrespect for a Superior Court judge), she discharged him.

He retaliated with a  campaign to destroy her with court process that must be read to be believed. He instituted frivolous litigation, breached confidentiality, made false statements and created false evidence. As the client testified, the attorney 's conduct turned her life upside down.

The hearing committee's report may be found at this **link** by inserting the attorney's name --Ellis S. Frison.

Comment from Stephen Williams:

> The Court of Appeals is exclusively charged with regulating the practice of law in the District of



**Wolters Kluwer**
Law & Business

**Best Friends at the Bar**
The New Balance for Today's
Woman Lawyer

Blakely

Learn More: WoltersKluwerLB.com
Contact Us: 1.800.950.5259

**Archives**

**Recent Posts**

From Insider Trader To Inside Prison

Bill Henderson is the 2d Most Influential Person in Legal Education - National Jurist Magazine

South Of The Border

Stand By Me

Letters from Jail

The Wrong Way

An Unscheduled Landing Leads To A Legal Malpractice Claim

Attorney Not Crucified For Unprofessional Remark

Illinois Battle Over Breach of Fiduciary Duty Charges

An Inappropriate Colloquy Gets A Judge Admonished

## Resources

**About Legal Profession Blog**
• Comments & Content to: jlipshaw[at]suffolk.edu

**Find Legal Profession Profs**
• Google Scholar
• Law Schools
• SSRN

**Ethics**
• ABA Center for Professional Responsibility
• ABA Ethics Search
• ABA Links to State Ethics and Professional Responsibility Sites
• ABA Model Rules of Professional Conduct
• American Legal Ethics Library, Cornell Law School
• Louis Stein Center for Law and Ethics (Fordham Law School)
• Miller-Becker Center for Professional Responsibility (Akron Law)
• SSRN: Legal Ethics and Professional Responsibility
• The Georgetown Journal of Legal Ethics

**Bar Admission and Discipline**
• NOBC, National Organization of Bar Counsel
• APRL, The Association of Professional Responsibility Lawyers
• National Conference of Bar Examiners
• Halt

**Firm Management**
• Centre for Professional Service Firm Management, Univ. of Alberta
• Clifford Chance Centre for the Management of Professional Service Firms, Univ.of Oxford

**The Profession**
• Harvard Law School Program on the Legal Profession
• Law.com
• Mondaq

Columbia. Short of Congress removing this authority from the Court, the Court is the only entity that is able to fix this problem. And yet, you repeatedly refuse to lay these shortcomings at the feet of the Court which is where it really belongs.

Stephen

UPDATE: I respectfully disagree with the above comment. My article No Stone Left Unturned is premised on the proposition that the D.C. Court of appeals made a fundamental error in creating and deferring to a board dominated by volunteer lawyers.

When the court issues an opinion that I disagree with, I say so --here's **an example.** (Mike Frisch)

December 24, 2012 in Bar Discipline & Process | Permalink

## TrackBack

TrackBack URL for this entry:
http://www.typepad.com/services/trackback/6a00d8341bf

Listed below are links to weblogs that reference
**Worst To First:**

## Comments

## Post a comment

### Verify your Comment

### Previewing your Comment

Posted by: |

This is only a preview. Your comment has not yet been posted.

Post   Edit  

Your comment could not be posted. Error type:
Your comment has been saved. Comments are moderated and will not appear until approved by the author. Post another comment

The letters and numbers you entered did not match the image. Please try again.

As a final step before posting your comment, enter the letters and numbers you see in the image below. This prevents automated programs from posting comments.

## Topical Archive

Abstracts Highlights - Academic Articles on the Legal Profession

Associates

Bar Discipline & Process

Billable Hours

Blogging

Books

Childress

CLE

Clients

Comparative Professions

Conferences & Symposia

Current Affairs

Economics

Ethics

Film

Food and Drink

Frisch

Games

General Counsel

Guest Bloggers from the Academy

Highlights from bepress and Law & Society Review

Hiring

Hot Topics

In-House

Interviewing

Judicial Ethics and the Courts

Law & Business

Law & Society

Law Firms

Lawyers & Popular Culture

Lipshaw

• National Law Journal
• SSRN: Law & Society: The Legal Profession

**Other Blogs**
• LawBizBlog
• Legal Ethics Forum
• My Shingle
• Robert Ambrogi's LawSites

**Free Legal Web Sites**
• Findlaw
• JURIST

**Recent Comments**

Ashley Casas on Stand By Me

Stephen Williams on Illinois Battle Over Breach of Fiduciary Duty Charges

Stephen Williams on The Worst Hearing Committee Report In D.C. Bar History

Lavelle Coleman on Buying Into License Revocation

Stephen Williams on With God As My Witness

Steve on Till Death Do Us Disinherit

Robert Gould on Loyalty Trumps Mobility In New Mexico Decision

Rick Underwood on What I Did For Love

Rick Underwood on What I Did For Love

Peter Gulia on What I Did For Love

**Blog Traffic**

sitemeter
883,159

Since September 18, 2006

**Blogware**

Powered by TypePad

**Notices**

Having trouble reading this image? **View an alternate.**

[ Continue ]  ⟳

Name:

[                    ]

☐ Remember personal info?

Email Address:

[                    ]

URL:

[                    ]

Comments:

[                    ]

[ Preview ]  [ Post ]

Monday Calendar of Programs and Events

Partners

Privilege

Pro Bono

Professional Responsibility

Rapoport

Religion

Science

Straddling the Fence

Teaching & Curriculum

Television

The Practice

Travel

Web/Tech

Weblogs

Weekly Top Ten: SSRN Legal Ethics & Professional Responsibility

The Archives

**Weekly Archives**

December 30, 2012 - January 5, 2013

December 23, 2012 - December 29, 2012

December 16, 2012 - December 22, 2012

December 9, 2012 - December 15, 2012

December 2, 2012 - December 8, 2012

November 25, 2012 - December 1, 2012

November 18, 2012 - November 24, 2012

November 11, 2012 - November 17, 2012

© Copyright All Rights Reserved
Contact post author for permissions

November 4, 2012 - November 10, 2012

October 28, 2012 - November 3, 2012

More...

**Professor Frisch's Blog Post
"Worst Report Affirmed"
July 28, 2014**

Legal Profession Blog

# A Member of the Law Professor Blogs Network

Sponsored by Wolters Kluwer

Monday, July 28, 2014

### Worst Report Affirmed

By Legal Profession Prof

In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

My take

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

From the BPR majority opinion

> We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, those conclusions did not lead to findings of serious ethical violations.

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and simply fail to deal with the evidence in a meaningful way.

These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

The BPR report can be found at this link under the names Szykmowicz, Szymkowicz, Silverman and King. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2014/07/worst-report-affirmed.html

© Copyright 2004-2013 by Law Professor Blogs, LLC. All rights reserved.

**Professor Frisch's Blog Post**
**"Worst Report Remanded"**
**September 17, 2015**

Legal Profession Blog

Thursday, September 17, 2015

# Worst Report Remanded

By Legal Profession Prof

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counter-factual fact findings.

First, the court accepts the hearing committee's findings that the elderly victim of the gross misconduct was legally competent.

> We take as a given for these purposes the Board's conclusions that Ms. Ackerman had the legal capacity to make the decisions at issue; wanted to transfer her assets to Dr. Ackerman's control; wanted to provide for Dr. Ackerman, even to her financial detriment; did not want the trust to continue; did not want Mr. Abbott to continue as trustee; was willing to pursue litigation to achieve these objectives; and was aware of the risks and costs of litigation. Nevertheless, there was evidence (largely if not entirely undisputed) of numerous other circumstances indicating a risk of conflicting interests requiring informed consent to joint representation.

My review of the record inescapably leads to a contrary conclusion to the findings of a obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

The remand requires an exploration of informed consent

> In the circumstances of this case, we conclude that the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained. The Hearing Committee did conclude that Mr. J.T. Szymkowicz obtained Ms. Ackerman's informed consent. Nevertheless, "[r]ather than deciding [that] issue without the benefit of the Board's judgment, we leave [the issue] for the Board to consider on remand . . . ." In re Hopkins, 677 A.2d 55, 63 n.17 (D.C. 1996). We do, however, note several issues that may merit the Board's consideration: (1) whether, as Bar Counsel contends, respondents bear the burden of establishing that they obtained informed consent or whether instead Bar Counsel bears the burden in disciplinary proceedings of establishing the absence of informed consent; (2) whether, as the Hearing Committee appears to have assumed, the determination whether Ms. Ackerman gave informed consent

should be made under the standard applicable to the determination whether a party had capacity to engage in a transaction; (3) whether Rule 1.7 (b)(2) is violated whenever the requisite informed consent is not in fact obtained, or whether instead it is a defense under the Rule that the attorney reasonably but mistakenly believed that informed consent had been obtained; (4) the implications of Rule 1.14, which addresses the obligations of a lawyer representing a client with diminished capacity, a topic we discuss infra with respect to the conflict-of-interest charges against Ms. Silverman and Mr. King; and (5) the date on which the Szymkowiczes ended their representation of Ms. Ackerman.

The court concludes that "Ms. Ackerman's mental capacity was indisputably diminished to a degree" and asks that the implications of Rule 1.14 be addressed on remand.

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2015/09/the-district-of-columbia-court-of-appeals-has-remanded-the-case-involving-the-worst-hearing-committee-report-in-dc-bar-hist.html

© Copyright 2004-2015 by Law Professor Blogs, LLC. All rights reserved.

**Professor Frisch's Blog Post**
**"The Most Blatant Regulatory Failure in D.C. Bar**
**History Nears a Conclusion"**
**May 22, 2017**

Legal Profession Blog

Monday, May 22, 2017

# The Most Blatant Regulatory Failure In D.C. Bar History Nears A Conclusion

By Legal Profession Prof

The seemingly endless saga caused by The Worst Hearing Committee Report In D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.

From my summary of the hearing committee report

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The hearing committee report was filed in October 2012.

Nearly two years later, the board filed its first report as we reported

> From the BPR majority opinion

>> We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.

A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, and for reasons that escape me, those conclusions did not lead to findings of serious ethical violations.

We noted the concurring board opinion and expressed some views about it

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and

simply fail to deal with the evidence in a meaningful way.

> These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

 The court remanded the case back to the board in September 2015.

I said at the time

> I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

Here, in May 2017, the board made true my prediction.

Disciplinary Counsel can appeal this atrocity to the court, which will face the moral dilemma of attempting to honor its fact finding standard of review (deferring to a hearing committee that utterly failed to do its job and a board unwilling to police it) and the undeniable facts that justify the severest discipline.

If there ever was a case in D.C. where the disciplinary system perpetrated a greater injustice and more fully failed in its stated public protection purpose, it has escaped my attention.

For those of sufficiently strong stomach, the report in In re Szymkovicz, Szymkovicz, Silverman & King can be accessed through this link. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2017/05/the-seemingly-endless-saga-caused-by-the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

**Professor Frisch's Blog Post**
**"D.C. Disciplinary Counsel Has New Leadership"**
**August 17, 2018**

Legal Profession Blog

Friday, August 17, 2018

# D.C. Disciplinary Counsel Has New Leadership

By Legal Profession Prof

The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.

With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.

Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts.

A case docketed for investigation in 2010 has resulted in a hearing committee report proposing a 30-day suspension with fitness and the usual "no harm, no foul" approach to the delay.

> Respondent also asserts that Disciplinary Counsel's delays during the investigation should be considered in mitigating sanction. Delay may be considered a mitigating factor in determining an appropriate sanction. In re Williams, 513 A.2d 793, 798 (D.C. 1986) (per curiam). But, the Court has clarified that the circumstances must be "sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." In re Fowler, 642 A.2d 1327, 1331 (D.C. 1994). Delays that are necessary to the decision-making process or the result of a respondent's own actions or inaction do not qualify. Id.

The wrong approach of the accused attorney did not help him

> the Hearing Committee has concluded that, at times, Respondent was evasive and was non-responsive to questions posed by the Hearing Committee members concerning his conduct. Respondent avoided responding to questions that might elicit acknowledgment of his wrongful conduct.

As to fitness

> Here, Respondent admitted during the disciplinary hearing that he purposefully left earned fees in his IOLTA (FF 41-43, 47), that he lacked an accounting system to track funds despite having a total of six bank accounts for his various business entities (FF 15, 41; DX 2 at Bates 7), and that he had failed to exercise supervision over his non-lawyer employees' access to his signature stamp for the IOLTA (FF 38). Respondent failed to acknowledge the wrongfulness of this misconduct, and his testimony reflected his failure to appreciate his fiduciary responsibilities for the clients' entrusted funds. Thus, Respondent's conduct during the disciplinary hearing raises a serious doubt that he will act ethically and competently in the future when handling entrusted funds. The Hearing Committee recommends that Respondent be suspended from the practice of law for 30 standards, and (2) he has taken a continuing legal education class on law practice days. As part of his proof establishing his fitness, Respondent should show that (1) he has sufficient accounting mechanisms in place to comply with Bar Rules and fiduciary management and accounting.

The case is In re Luis Salgado and can be found here.

Disclosure: Deputy Porter and I were colleagues  at Bar Counsel for a decade, regularly co-counseled cases (see, e.g.  here, here and  here)  and have co-taught ethics courses at Georgetown Law for many years.

I am biased in her favor. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2018/08/the-district-of-columbia-office-of-disciplinary-counsel-has-its-top-positions-in-place-with-the-elevation-of-julia-porter-to.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

**Professor Frisch's Blog Post**
**"District of Columbia Court Absolves Attorneys**
**of Horrific Elder Abuse Conflict"**
**November 8, 2018**

**ORIGINAL POST**

Legal Profession Blog

Thursday, November 8, 2018

# DIstrict Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has essentially affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorney s who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result.

A lone voice of integrity can be found in the dissent of Senior Judge John Steadman.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

I will have much more to say. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

**Professor Frisch's Blog Post
"District of Columbia Court Absolves Attorneys
of Horrific Elder Abuse Conflict"
November 8, 2018**

**UPDATED POST**

Legal Profession Blog

Thursday, November 8, 2018

# District Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has in a per curiam decision  affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorneys who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

A hollow tsk tsk is all the court can muster

> In sum, although we fully understand Disciplinary Counsel's concerns about the Szymkowiczes' conduct in this case, we accept the Board's conclusion that the Szymkowiczes were not shown by clear and convincing evidence to have violated Rule 1.7.

The court majority's "full understanding" offers faint if no hope to future victims. And does nothing to instruct the Bar and public on the ethics of elder care abuse.

Rather, the court's discussion of burden shifting has no practical consequence but to tie the hands of Disciplinary Counsel in proving conflicts.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result

The lone voice of concern can be found in the dissent of Senior Judge John Steadman

> I disagree that the structure of criminal law presents a fair analogy. Bar discipline proceedings are designed to ensure that attorneys abide by the rules of professional conduct that their license demands and to protect the public accordingly.

Not today.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair as I blogged

> When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

> And then, this from the committee chair's law partner hits my in box:

> > My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal compentency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical

violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment..and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

In its wisdom, the board refused to consider the above email. Ignoring it was more convenient.

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.

This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-BG-0100

IN RE LARRY KLAYMAN

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-48-08)

(Argued September 17, 2019                         Decided June 11, 2020)

*Stephen A. Bogorad*, with whom *John Thorpe Richards, Jr.*, was on the brief, for respondent.

*H. Clay Smith, III*, Assistant Disciplinary Counsel, with whom *Elizabeth A. Herman*, Deputy Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before FISHER, THOMPSON, and BECKWITH, *Associate Judges*.

PER CURIAM:   The Board on Professional Responsibility (the "Board") has recommended that this court suspend respondent Larry Klayman from the practice of law for ninety days based on his representation of three clients in violation of Rule 1.9 (conflict-of-interest) of the District of Columbia Rules of Professional Conduct (or its Florida equivalent).   In this matter, the Office of Disciplinary Counsel

("Disciplinary Counsel") takes exception to the Board's report and recommendation on three grounds. First, Disciplinary Counsel challenges the Board's rejection of the finding by Hearing Committee Number Nine (the "Hearing Committee") that Mr. Klayman violated District of Columbia Rule of Professional Conduct 8.4(d). Second, Disciplinary Counsel takes exception to the Board's rejection of the Hearing Committee's finding that Mr. Klayman gave false testimony and made false representations to the Hearing Committee. Finally, Disciplinary Counsel takes exception to the Board's recommendation that we impose a ninety-day suspension without a requirement that Mr. Klayman prove his fitness before being reinstated. For the reasons that follow, we accept the Board's recommendations.

## I.

The Board adopted most of the factual findings of the Hearing Committee, including as to the following, a summary regarding the three matters that underlie this disciplinary matter. Mr. Klayman founded Judicial Watch and served as its in-house general counsel from its inception in 1994 until 2003. During Mr. Klayman's tenure at Judicial Watch, Sandra Cobas served as the director of Judicial Watch's Miami Regional Office. She complained to Judicial Watch about her employment

Case 1:20-cv-03579-CJN   Document 1   Filed 08/26/20   Page 85 of 100
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 4 of 14   PageID 126

3

conditions, alleging that she was subject to a hostile work environment during several weeks in 2003. As general counsel, Mr. Klayman provided legal advice to Judicial Watch concerning Cobas's claims. After both Mr. Klayman and Ms. Cobas had ended their employment with Judicial Watch, Ms. Cobas filed a complaint against Judicial Watch in a Florida state court, making the same hostile-work-environment allegations. The Florida trial court granted a motion to dismiss the case (calling the complaint "'silly and vindictive'"). Thereafter, without seeking consent from Judicial Watch, Mr. Klayman entered an appearance on Ms. Cobas's behalf and filed a motion requesting that the trial court vacate its order of dismissal. When the motion was denied, Mr. Klayman filed a notice of appeal on Ms. Cobas's behalf and, later, a brief in a Florida appellate court, but the appellate court affirmed the dismissal.

In 2002, while still employed by Judicial Watch, Mr. Klayman solicited a donation from Louise Benson as part of a campaign to raise funds to purchase a building for the organization. Klayman was acting as both chairman and general counsel of Judicial Watch when he solicited this donation from Benson. Ms. Benson committed to donate $50,000 to the building fund, and thereafter paid $15,000 towards that pledge. Judicial Watch did not purchase a building. In 2006, after Mr. Klayman had left Judicial Watch, he and Ms. Benson filed a lawsuit against Judicial

Watch in federal court, where they were represented by attorney Daniel Dugan. Ultimately, the federal district court dismissed Ms. Benson's claims (but not Mr. Klayman's claims) on jurisdictional grounds. Shortly thereafter, Ms. Benson sued Judicial Watch in the Superior Court of the District of Columbia, alleging *inter alia* unjust enrichment and seeking a return of her donation. Initially, she was represented in that suit by Mr. Dugan. Eventually, and without seeking consent from Judicial Watch, Mr. Klayman entered an appearance in the case as co-counsel for Ms. Benson. Judicial Watch requested that Klayman withdraw, stating that he organized the fundraising effort that was at the center of Ms. Benson's complaint while he was Judicial Watch's attorney, and noting that Ms. Benson had identified him as a fact witness. When Mr. Klayman did not withdraw, Judicial Watch moved to disqualify him. The motion for disqualification was never decided, as the parties stipulated to the dismissal of the case.

In 2001, while Mr. Klayman was still employed by Judicial Watch, Judicial Watch and Peter Paul entered into a representation agreement, and a modification thereto, under which Judicial Watch agreed to evaluate legal issues emanating from Mr. Paul's fundraising activities during the election campaign for the New York State Senate in 2000 and to represent him in connection with an investigation into alleged criminal securities law violations and possible civil litigation stemming from

those fundraising activities.   Mr. Klayman drafted, edited, and approved the representation agreement and modification and authorized the signing of both documents as Judicial Watch's chairman and general counsel.  Judicial Watch later represented Mr. Paul in a civil lawsuit brought in California state court.  Following Mr. Klayman's departure from Judicial Watch, Judicial Watch withdrew from the representation.   Thereafter, Mr. Paul sued Judicial Watch in the United States District Court for the District of Columbia alleging, among other theories, that Judicial Watch breached its representation agreement with him.   While Mr. Paul initially was represented by Mr. Dugan, Mr. Klayman entered an appearance in the case without seeking Judicial Watch's consent.  Judicial Watch moved to disqualify Mr. Klayman.   The district court (the Honorable Royce Lamberth) granted the motion to disqualify, finding that Mr. Klayman's representation of Mr. Paul violated Rule 1.9.  The court found that Mr. Klayman was representing the plaintiff "in a matter directly arising from an agreement he signed in his capacity as [g]eneral [c]ounsel for the current defendant" and that Mr. Klayman's representation of Mr. Paul was "the very type of 'changing of sides in the matter' forbidden by Rule 1.9."

The Hearing Committee found that Mr. Klayman violated Rule 1.9 (or its Florida equivalent) in all three matters and violated Rule 8.4(d) in the Paul matter. It also found that Mr. Klayman gave false testimony before the Hearing Committee

and that his disciplinary history in Florida in connection with an unrelated matter was another aggravating factor.  On the basis of all the foregoing, the Hearing Committee recommended that Mr. Klayman be suspended for ninety days, with reinstatement contingent upon a showing of his fitness to practice law.  The Board, by contrast, recommended that Klayman be suspended for ninety days with no fitness requirement.  The Board disagreed with the Hearing Committee's finding that Disciplinary Counsel proved a violation of Rule 8.4(d) and with its finding that Mr. Klayman provided false testimony.

Before this court, neither Mr. Klayman nor Disciplinary Counsel takes issue with the finding that Mr. Klayman violated Rule 1.9 or its Florida equivalent in the matters described above, and we therefore need not address that finding.  Rather, as the Board did, we adopt the vast majority of the Hearing Committee's thorough analysis.  However, as noted above, Disciplinary Counsel takes exception to the Board's findings regarding Rule 8.4(d) and false testimony, and to the Board's recommended sanction insofar as it omits a fitness requirement.  We discuss these matters below.

**II.**

Disciplinary Counsel has the burden of proving a violation of the Rules of Professional Conduct by clear and convincing evidence. *In re Speights*, 173 A.3d 96, 99 n.3 (D.C. 2017). "When reviewing a recommended disciplinary sanction against an attorney, this court must accept the Board's findings of fact if they are supported by substantial evidence." *In re Sneed*, 673 A.2d 591, 593 (D.C. 1996). The Board "has the power to make its own factual findings" but "must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013) (internal quotation marks and emphasis omitted). "Substantial evidence means enough evidence for a reasonable mind to find sufficient to support the conclusion reached." *In re Thompson*, 583 A.2d 1006, 1008 (D.C. 1990). "[T]he Board and this court owe no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and thus are reviewed *de novo*." *Bradley*, 70 A.3d at 1194. "Whether [a] respondent gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." *Id.* "[T]his court usually adopts the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted[.]'" *Sneed*, 673 A.2d at 593.

8

### III.

Rule 8.4(d) establishes that it is professional misconduct for a lawyer to "[e]ngage in conduct that seriously interferes with the administration of justice[.]" *Id.* For conduct to violate Rule 8.4(d), the conduct must be improper, "bear directly upon the judicial process," and "taint the judicial process in more than a *de minimis* way." *In re Carter*, 11 A.3d 1219, 1224 (D.C. 2011) (internal quotation marks omitted).

Disciplinary Counsel asserts that the "Board erred by overturning the Hearing Committee's conclusion that Mr. Klayman violated Rule 8.4(d) when he appeared on behalf of [Mr.] Paul with a 'clear conflict of interest' and litigated against disqualification for the second time." The Board cited a number of reasons for rejecting the Hearing Committee's conclusion, including its longstanding "concern[]" about the scope of Rule 8.4(d) in litigation-related disciplinary matters" and its view that any Rule 8.4(d) violation would be "derivative of the conflict[-]of[-]interest finding." But the Board primarily followed this court's lead in considering the views of the judge who presided over the litigation in which the disqualification motion was filed. *See In re White*, 11 A.3d 1226, 1232 (D.C. 2011). The Board found it "extra significan[t]" that Judge Lamberth, though he granted the motion to disqualify

Case 1:20-cv-03579-CJN   Document 1   Filed 08/26/20   Page 91 of 100
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 10 of 14   PageID 132

9

Mr. Klayman, found "'a legitimate debate about [Mr. Klayman's] conduct'" and further found that Mr. Paul was a needy client who could not otherwise have afforded legal services. In light of the "extraordinary situation" of Judge Lamberth's "supportive testimony" to the Hearing Committee, the Board was unable to conclude that Mr. Klayman's "behavior sufficiently tainted the judicial process to a degree adequate to sustain the Rule 8.4(d) charge."[1] We accept the Board's reasoning and agree that no Rule 8.4(d) violation was proven by clear and convincing evidence.


## IV.


Before the Hearing Committee, Mr. Klayman testified, "I believed that Mr. Dug[]an had given the advice of counsel that I could do this [i.e., represent Ms. Benson], otherwise he [Dugan] wouldn't have prepared the pleading" opposing the motion to disqualify Mr. Klayman based on Rule 1.9." The Hearing Committee found that this testimony was false, as was Mr. Klayman's testimony that Mr. Dugan "was the one who prepared the response to that disqualification motion."

---

[1] The Board noted that in *White*, by contrast, Judge Lamberth concluded that White's conduct had tainted the proceedings; specifically, "[t]he entire litigation was disrupted and delayed while the [d]istrict [c]ourt dealt with the motion to disqualify[,]" and the court had to strike an entire deposition because of White's presence. *Id.* at 1232.

Disciplinary Counsel contends that this court should defer to the Hearing Committee's false-testimony findings as supported by substantial record evidence.

The Board found that Disciplinary Counsel failed to prove by clear and convincing evidence that Mr. Klayman gave false testimony.  The Board observed that the Hearing Committee had relied almost entirely on Mr. Dugan's testimony that he did not endorse Mr. Klayman's appearance in the Benson matter.  The Board reasoned, however, that the forcefulness of Mr. Dugan's testimony was undercut by his repeated inability to recall the substance of key conversations that took place between him and Mr. Klayman eight years earlier.  In addition, the Board cited prior, "apparently inconsistent" statements that Mr. Dugan had made about the matter (e.g., Mr. Dugan's apparent statement to Judicial Watch's counsel, referred to in Judicial Watch's memorandum in support of its motion to disqualify, that there was "no ethical issue arising from" Mr. Klayman's representation of Ms. Benson).

The Board's description of Mr. Dugan's "diminished recollection" of  his discussions with Mr. Klayman about the latter's entry of his appearance in the Benson matter, and about Judicial Watch's demand that Mr. Klayman withdraw from the representation, is supported by the record.  Further, while the Hearing Committee reasoned that Mr. Klayman "cannot have inferred" that Mr. Dugan

blessed his entry of appearance in the Benson matter from Mr. Dugan's filing of the opposition to the motion to disqualify since Mr. Dugan "did not write the opposition[,]" Mr. Dugan acknowledged that his associate may have edited the draft opposition before it was filed, acknowledged that he (Dugan) did *sign* the opposition, and testified that he would not have done so if he had thought that it was frivolous or thought it violated any ethics or pleadings rules.   Additionally, Mr. Klayman's testimony was to the effect that the circumstances caused him to *believe* that Mr. Dugan had given the advice of counsel.  We agree with the Board that there was not proof by clear and convincing evidence that Mr. Klayman testified dishonestly as to his belief and recollection.  Accordingly, we accept the Board's conclusion rejecting the finding that Mr. Klayman testified falsely.

## V.

In explaining its sanction recommendation, the Hearing Committee found that Mr. Klayman's misconduct was aggravated by his prior discipline in Florida and his denial of responsibility as to the underlying conduct.  He received a public reprimand in that jurisdiction after he failed to timely pay the full amount ($5,000) he had agreed to repay to a former client after mediation to resolve a fee dispute.  The Board gave this matter little weight because of Mr. Klayman's explanation that a serious

car accident had rendered him unable to work at full capacity and caused him "significant financial difficulties" that affected his ability to pay.  We accept that evaluation.

We also accept the Board's conclusion that Disciplinary Counsel did not show that a fitness requirement is warranted in this case.  To be sure, Disciplinary Counsel proved that Mr. Klayman flagrantly violated Rule 1.9 on three occasions.  His misconduct was not isolated, and, it appears, he acted vindictively and "motivated by animus toward Judicial Watch" (with which he had developed an acrimonious relationship).  We agree with the Board and the Hearing Committee that his misconduct was intentional rather than inadvertent or innocent.  We also readily agree with the Board that his misconduct — involving a "switch[ing of] sides" that strikes at the integrity of the legal profession — deserves the serious sanction of a ninety-day suspension.  Nevertheless, we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically.  *In re Adams*, 191 A.3d 1114, 1120 (D.C. 2018).  Accordingly, we decline to impose a fitness requirement.  We do, however, concur with Disciplinary Counsel's original recommendation that Mr. Klayman be ordered to complete a continuing legal education ("CLE") course on conflicts of interest.

Case 1:20-cv-03579-CJN   Document 1   Filed 08/26/20   Page 95 of 100
Case 3:20-mc-00043-B   Document 7   Filed 07/01/20   Page 14 of 14   PageID 136

13

Wherefore, effective thirty days after entry of this order, Mr. Klayman is suspended from the practice of law.   The period of suspension is ninety days, commencing after he has filed the affidavit required by D.C. Bar R. XI, § 14(g). Before reinstatement, he must also complete a CLE course on conflicts of interest.[2]

*So ordered.*

---

[2]  The pending motion by his counsel to withdraw is hereby granted.

EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

**In Re: Larry Klayman**

Case No.:  3:20-mc-00043-B

**LARRY KLAYMAN'S MOTION TO CHIEF JUDGE BARBARA M.G. LYNN TO**
**INTERVENE IN THE INTERESTS OF JUSTICE AND THE PROPER**
**ADMINISTRATION OF THIS COURT AND TO VACATE ORDERS OF THE**
**HONORABLE JANE BOYLE IMPOSING RECIPROCAL DISCIPLINE WITHOUT**
**DUE PROCESS OF LAW AND TO ADHER TO AND COMPLY WITH  RULE**
**83.8(H)(3) OF THIS COURT**

Larry Klayman ("Mr. Klayman") hereby respectfully requests the Honorable Chief Judge Barbara M.G. Lynn to intervene in the above styled matter, as the Honorable Jane Boyle has imposed reciprocal discipline in contravention of constitutional norms of due process which are embodied in Rule 83.8(h)(3) of this Court. The grounds for the motion are as follows.

First, Judge Boyle, apparently based on an initially undisclosed letter written by a  very partisan District of Columbia Bar Disciplinary Counsel, who lacked any authority to intervene in this matter, issued a show cause order on June 15, 2020. ECF No. 1. Mr. Klayman responded by advising Judge Boyle that the subject order of the District of Columbia Court of Appeals from June 11, 2020 was subject to challenge, as petitions for rehearing before the original panel and en banc were filed.  ECF No. 2, 4, 5. To this day, Mr. Klayman's challenges have not been finally decided, as set forth in Mr. Klayman's filing of August 17, 2020. ECF No. 10.

Second, Mr. Klayman made it clear from the commencement of this matter that if Judge Boyle decided to attempt to unilaterally impose reciprocal discipline that he wanted to

opportunity to retain counsel with full hearing rights pursuant to Rule 83.8(h)(3), which provides:

> If the member responds and, in whole or in part, opposes reciprocal discipline, the chief judge, or a district judge designated by the chief judge, must designate three district judges to hear the matter. The decision of a majority of the three-judge panel concerning the appropriate discipline shall be the final ruling of this court.

Third, just today, Judge Boyle denied Mr. Klayman's latest motion, filed by newly retained undersigned counsel, refusing to provide him with the due process rights required by Rule 83.8(h)(3).

Fourth, it would appear that Judge Boyle has been in contact with a very partisan District of Columbia Bar Disciplinary Counsel, and her actions may be agenda driven, since Mr. Klayman is a high profile public advocate founder of Judicial Watch and Freedom Watch, in addition to his private practice. In this regard, he has filed high profile cases before this Court concerning Black Lives Matter, Louis Farrakhan, New Black Panthers Party and others over the Dallas Police Massacre on July 7-8, 2016 (3:16-cv-2010) and most recently a class action lawsuit against Defendants The People's Republic of China to seek redress for the damages caused by the ongoing worsening pandemic. (3:20-cv-656). Mr. Klayman has also filed a lawsuit, which is currently on appeal, on behalf of African American police officer and Texas congressional candidate, Demetrick Pennie, over libel and defamation from the Dallas Morning News, which was alleged to have acted in concert with other Defendants, some of which are public officials. (3:19-cv-1945).

Fifth, even before Judge Boyles' order of today, she had precipitously ordered the clerk to remove Mr. Klayman's electronic filing privilege, preventing him from filing pleadings in the ongoing case against the People's Republic of China. Previously, before even imposing

reciprocal discipline, however improper and without due process, she ordered Mr. Klayman not to file any more cases in this Court. ECF No. 6.

Sixth, it would appear that Judge Boyle harbors some unknown animus against Mr. Klayman for some unknown reason, particularly since he has never appeared in front of her. While Judge Boyle is entitled to her opinion of Mr. Klayman based on whatever reason, she is not entitled to violate the Constitution and the internal rules of the Court. Accordingly,   all of her orders should be vacated and this matter referred to a three judge panel with a full hearing pursuant to Rule 83.8(h)(3).

Mr. Klayman respectfully requests that the Court to review the entire file to confirm the accuracy of these representations. If the Honorable Barbara M.G. Lynn chooses not to intervene, Mr. Klayman requests that this matter be referred to the Judicial Council. Lastly, Mr. Klayman respectfully requests disclosure of all further *ex parte* communications, whether orally or in writing.  Mr. Klayman and his clients have been prejudiced and this matter should respectfully proceed expeditiously

Dated: August 18, 2020                              Respectfully submitted,

                                            */s/ Sanjay Biswas*
                                            Sanjay Biswas, Esq.
                                            TX Bar # 24061235
                                            11720 Duxbury Dr.
                                            Frisco, TX, 75035
                                            Tel: 972-866-5879
                                            sanjaybiswas41@gmail.com

                                            *Counsel for Respondent*

                                            */s/ Larry Klayman*
                                            Larry Klayman, Esq.
                                            KLAYMAN LAW GROUP, P.A.

7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
Email: leklayman@gmail.com

*Respondent Pro Se*